## SEPTEMBER TERM, 1894.

McBRIDE v. THE PEOPLE.

1. CRIMINAL LAW—CORPUS DELICTI.
The *corpus delicti*, in all cases of homicide, must be proved as an essential condition to conviction. To establish it, it must be shown that the deceased died from the effect of a wound, that this wound was unlawfully inflicted, and that the defendant was implicated in the crime.

2. SAME—EVIDENCE.
In proof of criminal intent or guilty knowledge, any other acts of the party, contemporaneous with the principal transaction, may be given in evidence ; yet such evidence regularly ought not to be introduced, until the principal fact, constituting the *corpus delicti*, has been established.

3. EVIDENCE—DYING DECLARATIONS—OPINIONS.
Dying declarations are admissible in evidence only in case of homicide where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of such declarations. Opinions in dying declarations are not admissible.

4. INSTRUCTIONS.
An instruction not supported by the evidence, or at variance with it, is erroneous.

*Error to the District Court of Arapahoe County.*

IN March, 1892, plaintiff was tried for the murder of his wife, was convicted of murder in the second degree and sentenced for life.

The wife died December 31, 1891, as supposed and alleged, from injuries inflicted by the husband in beating and kicking her, some three weeks previous. The husband and wife kept a grocery store and sold spirituous liquors and beer. According to all the testimony, both were confirmed inebriates and had been for two or three years, getting stupidly drunk, sometimes jointly or in company with each other, and at other times individually and separately. When under the influence of liquor, which was most of the time, towards the

close of the wife's life, quarrels and personal encounters were frequent.

Previous to any evidence establishing the *corpus delicti*, being the first evidence introduced, the prosecution, by several witnesses, made proof of former drunken quarrels of the husband and wife, proving frequent personal conflicts for two years before the death, throwing bottles and other missiles at each other, but no evidence that those thrown by the husband hit the wife. The evidence of all was, they never saw him hit or kick her. The conditions were tersely and pathetically described by the twelve years old son in his evidence, as follows: "Defendant is my father. Mother died December 31, 1891, at night. Father was at Houston's. He went away Monday morning. Mother's eyes was black. Saw disturbance between father and mother. Don't know how many times. Threw cups and bottles at each other, sticks and brickbats. He kicked at her out of the door. Father hit her with a boot and she hit him." Cross-examination by Mr. Dunklee: "They were both drunk. Have seen them drunk often. When they were drunk they would fight."

The evidence establishes the fact that the wife was so addicted to the use of liquor that, for a long time previous to the alleged injuries, she was hardly ever free from its influence, and at times helplessly drunk; that previous to the alleged assault by the husband she had fallen down cellar; had fallen in other places. Once she was found lying outside of the house. At another time she was found with two children some distance from the house, in a ravine, without cover or consciousness, in cold, inclement weather. Some two weeks before her death she was confined to her bed, and on December 28th a physician, Dr. Bilby, was called. Her condition until the time of death he gave as follows: "Was called to see Mrs. McBride, December 28, 1891, in the morning. Saw McBride himself, his wife, and two or three children. Mrs. McBride was in a critical condition. Had an inflamed throat; was vomiting blood; had a pain in her

stomach; also complained of her throat. Saw her five times before she died, December 31st. Her throat was in a very bad condition, and she said she had not been able to take any nourishment for two weeks; throat looked as though she had been taking carbolic acid. He said she had been on a protracted spree, and had drunk about two gallons of liquor in two weeks. I made an examination the second visit, on the 29th, found a bruise on her eye, a number of bruises on her body, and bruises on the right side, one on left hip, and one an inch and a half below the nipple. That was all the bruises I found. She continued to get worse; could not retain any nutrition. Vomited blood as often as every ten or fifteen minutes. Q. State to the jury the condition of deceased, when you called, December 28th? A. I stated yesterday, I found her very much emaciated, complaining of throat trouble, vomiting blood, pain in the bowels, little grievance in abdominal cavity. That was her condition; skin pale, face poor and emaciated. Made no chemical examination of her urine. Q. Doctor, what, in your opinion, caused the death of this woman? (Objection. Overruled. Exception.) A. Lack of nutrition and loss of blood, caused by some internal injury. Q. From your examination, what, in your opinion, caused the internal injury? (Objection. Overruled. Exception.) A. From the blows that had been delivered on the external parts." Cross-examination by Mr. Dunklee: "She told me December 28th, that she had been drinking, for stimulants. Her throat looked as though she had been taking something; that is why I asked her. On the first visit I gave her bismuth to try to allay the vomiting; chloride of potash and tincture of iron for the throat trouble, with fomentum over the abdomen. She was much run down. It seemed to be a case of extreme exhaustion. I told Mr. McBride that she had what some people might call la grippe. Her skin was pale, whitish. Gave a Dover's powder the third visit. Made no examination of urine, except looking at it. Can tell by the color of urine whether there is albumin in it or not. It was a careful exam-

ination. Think there was no albumin in the urine, because
it was a normal color. Do not know that the urine I exam-
ined was Mrs. McBride's except what the nurse said. Q. Doc-
tor, it is a fact, then, that you believe that was an internal
injury? A. Yes, sir. Q. Believe that now? A. Yes, sir.
Q. Believe it was a rupture? A. Yes, sir; of the stomach and
intestines. Q. Suppose that on a post-mortem examination
of the person, in which all parts of the internal organs were
examined, and there was no rupture and no internal injury
whatever, would you still say that the blood came from a
rupture? A. I would not if I made the examination or seen
the examination made. Q. But you would not trust any
other physician—is that right? A. Under that condition, I
would, of course, have to give up that I was wrong." Dr.
Bilby was asked the following question in regard to his first
visit (December 28th) : " Didn't her husband say to you in
her presence *that she had been on a two weeks' spree?* A. Yes,
sir; she said she had been drinking. * * * He said she had
been on a protracted spree and had drunk about two gallons
of liquor in two weeks."

An official autopsy was had, made by Drs. E. R. Axtell
and R. B. Knight. Dr. Knight testified, after stating in
regard to external bruises and discolorations : "I would say
that she died of hemorrhage and exhaustion. * * * We found
evidences of an old inflammation of the mitral valve of the
heart of deceased, in the last stages of Bright's disease, and
of hemorrhage from the nostrils; and the patient lying in bed,
the blood would naturally go into the stomach and be thrown
off by vomiting. *There was no rupture of the stomach, none
of the bruises would reach the internal organs.*" When recalled,
in answer to an elaborate hypothetical question, wherein it
was assumed that the woman had been knocked down, jumped
upon and violently kicked in the abdomen and near the
kidneys : " Assuming all those added to the post-mortem what
do you now say in your opinion? A. *That the woman died
of exhaustion and from chronic alcoholism, with probably the
Bright's disease as a factor in it. The blood would have a marked*

*effect in bringing about the dissolution.*" And in answer to questions by the jury he testified as follows: " Could not tell the cause of death from the autopsy. To tell whether the deceased died of Bright's disease, would have to take into consideration the symptoms while living. This woman did not die of a shock. There were no evidences of any disease except Bright's. By the jury: Q. If this woman received the blows that caused those black and blue spots that were on the body, that you testified to, they would cause the stomach to be ruptured—that would cause death? A. If the stomach was ruptured; but the stomach was not ruptured. Q. What would cause the throwing off of blood? A. I don't know. A dozen causes—an inflammation of the membrane of the stomach; indigestion; of taking things into the stomach that could not be digested; a degeneration and breaking down of the walls of these vessels—dozens of causes. By the jury: In the early part of your examination you said that a kick in the abdomen, and also striking the front part of the stomach, might produce congestion of the kidneys? A. Yes, sir. Q. Did you find, on your post-mortem examination, any indication of a blow on the front part of the person? A. We did not."

Dr. Axtell testified: " We found the mitral valve of the heart affected. The kidneys were affected, also the capsule strips indicated Bright's disease. * * * We found no internal rupture, * * * no internal wounds. * * * The stomach was normal. Q. From the symptoms you saw there, did she have Bright's disease? A. I did not see the woman until after her death, but what we saw in her kidneys, she had Bright's disease. The diagnosis I made at the time was a chronic form."

Statements made by deceased shortly before death were allowed in evidence as dying declarations. The foundation for their admission was as follows: On the morning of December 29th (Dr. Bilby) " I says to her, 'You might just as well tell me what brought you on.' She says: 'He first struck me with his fist and knocked me down and jumped

on me and kicked me, that is what caused these bruises and also the bruise on my eye.' *She told me she did not think it worth while for me to come back; did not think I could do her any good.*"

On the evening of the 30th, at five o'clock, 36 hours after having told how the bruises were received, "I told her that her chances for life were slim, that I did not see any chance. I could not relieve her. She said she was going to die; did not think there was any hope for her. This was about five o'clock in the evening. This was not the visit that she told me what caused the bruises on her body; that was on the morning of the 29th. She made no statement to me at this time—the time she said she was going to die—because we had talked the matter over before."

Wm. H. Reno testified that on the 31st, the day of her death: "I asked her if she was suffering from injuries inflicted by her husband, and she nodded her head, 'Yes.' I then asked her if she had received these injuries some two or three weeks previous, and she nodded her head, 'Yes.' That was about the only conversation I had with her. She was in very low condition. I took the nod of the head as meaning yes. That was all the reply I got."

Frank Mulock testified: "Had a conversation with Mrs. McBride the night she died—December 31st—concerning her condition, and who caused her injuries. (Objection, because his name was not on information before trial. Overruled. Exception.) I asked her what seemed to be the matter, and she said: 'I am going to die.' 'Oh,' I says, 'I guess you will not.' I said, 'Who hit you?' She says: (Objected to as incompetent. Objection overruled. Exception.) 'My husband has killed me.' I says, 'What did he do to you?' She said, 'He kicked me here' (on side), and it hurt her arm and her eye. I told her, 'You will be all right in the morning,' and she says, 'No, I am afraid.' She said this occurred about two weeks ago, and that he was in the habit of kicking her. She was in a bad condition."

Henry Caswell was the only witness that testified to hav-

ing seen the defendant strike or kick the deceased: " I saw McBride and 'his wife on or about the 19th day of December, 1891. Mrs. McBride was in the kitchen. I could see through the open door. Don't know what they said. I looked around in about two minutes; Mrs. McBride was out in front; Mr. McBride was over her; he kicked her once; I do not know whether in the back or side. He said: ' You God damned son of a bitch, I will kill you.' Saw them pretty near every day for three years. Never saw him kick her before. I saw him pick up a rock, and hit her in the back, about a year and a half ago, I think. Saw him twice throw rocks at her."

Two witnesses, Switser and Franklin, were called to impeach Caswell, and testified, after usual foundation, that they would not believe him under oath.

Mr. Geo. F. Dunklee and Mr. O. E. Jackson, for plaintiff in error.

The Attorney General and Mr. H. T. Sale, of counsel, for the People.

Reed, J., delivered the opinion of the court.

There are several errors assigned, only a few of which it will be necessary to discuss.

The admission of the evidence of several witnesses in regard to quarrels of the husband and wife and violent altercations when both were drunk, in a period of two years previous to the death, is assigned as error. This evidence was the first introduced. The *corpus delicti* had not been proved or attempted.

" The *corpus delicti* in murder has two components: death as the result, and the criminal agency of another as the means." And. Law Dict. " The *corpus delicti*, in all cases of homicide, must be proved as an essential condition of conviction. To the *corpus delicti*, in this sense, * * * it is

requisite: 1st, that the deceased should have been shown to have died from the effect of a wound; 2nd, that it should appear that this wound was unlawfully inflicted, and that the defendant was implicated in the crime." 1 Whart. Cr. Law, sec. 311. "And even when the body has been found, and although indications of a violent death be manifest, it shall be fully and satisfactorily proved that the death was neither occasioned by natural causes, by accident, nor by the act of the deceased himself." Stark. on Ev. 862, 863. "The proof of the charge in criminal causes involves the proof of two distinct propositions: first, that the act itself was done; and, secondly, that it was done by the person charged, and by none other." 3 Greenl. Ev., sec. 30.

The facts proved were no part of the *res gestæ;* were in no way connected with the offense charged. Proof of periodical drunken quarrels of the husband and wife carried on for two years, ending in no serious injury and not characterized by any apparent intention to do great bodily injury, when the violence and altercation appeared to be mutual, and there was no proof of which was the aggressor and precipitated the collision, should not have been admitted at that stage of the proceeding. Such evidence was only admissible in connection with a well established *corpus delicti*, and it is very doubtful whether proof of such indefinite facts and acts would have been admissible in the case at any time. No *corpus delicti* having been proved, it was error to admit the evidence to assist in establishing a subsequent doubtful *corpus delicti*. Such evidence is never admissible except after the *corpus delicti* has been fully established; then only for the purpose characterizing the offense, as proof of malice, motive or criminal intention.

"In the proof of *criminal intent* or *guilty knowledge, any other acts* of the party, *contemporaneous* with the principal transaction, may be given in evidence, * * * yet such evidence regularly ought not to be introduced, until the principal fact, constituting the *corpus delicti*, has been established."

3 Greenl. Ev., sec. 19; 1 Greenl. Ev., sec. 53; *Shaffner v. Commonwealth*, 72 Pa. St. 60.

The whole of such evidence admitted only went to the proof of such facts and altercations when the parties were crazed and irresponsible from liquor, and that they continued to live together as husband and wife, and, as far as the proof went, peaceable when sober. Such being the established facts, the proof of such acts neither gave character to the offense charged, proved criminal intent or malice; consequently were not admissible for any purpose and must have been prejudicial to the defendant, furnishing a basis from which the jury might infer the fact of a subsequent killing.

The court erred in admitting evidence of the statements of deceased, characterized and admitted as dying declarations. The law in regard to the admission of such evidence is well settled and has been for an indefinitely long period; so well settled that it is hardly necessary to cite authorities, and only to state the well established elementary principles that control it. Dying declarations are in their nature secondary and hearsay evidence, an exception to the general rule. Such being the case, they are very carefully scrutinized.

" Dying declarations are statements of material facts concerning the cause and circumstances of homicide made by the victim under the solemn belief of impending death, the effect of which upon the mind is regarded as equivalent to the sanctity of an oath. They are substitutes for sworn testimony, and must be such narrative statements as a witness might properly give on the stand if living." *People v. Olmstead*, 30 Mich. 431 ; *Starkly v. People*, 17 Ill. 21. They are admissible only in case of homicide where the death of the deceased is the subject of the charge, and the circumstances of *the death* are the subject of such declarations.

As before stated, the *corpus delicti* must be clearly, unequivocally established, that the condition and contemplated death were caused by violence, and the evidence must be such as to negative clearly all probability of death from natural causes; then the circumstances attending the infliction of the

fatal injuries, and by whom inflicted, are admissible, not otherwise. Tested by these well settled rules, the supposed dying declarations were clearly inadmissible.

The attending physician at first supposed and reported it as a case of "grippe;" next, after an examination of the patient, and finding external bruises or discolorations, he adopted the supposition that the effect of the external violence had been to rupture internal organs, and that the patient was dying of such rupture.

Dr. Bilby was asked: "Now, doctor, please state to the jury what Mrs. McBride said to you at this time (morning of December 29) * * * concerning these bruises upon her body?" And he answered that she, in reference to each of them, said that they were inflicted by her husband.

Reno testified: "I asked her if she was suffering from injuries inflicted by her husband and she nodded her head, 'Yes.' I then asked her if she had received these injuries some two or three weeks previous. She nodded her head, 'Yes.' That was about the only conversation I had with her. * * * She was in a very low condition. I took the nod of the head as meaning yes. That was all the reply I got."

Mulock testified: "She said she was going to die. 'Oh,' I says, 'I guess you will not.' I said, 'Who hit you?' She says, 'My husband has killed me. * * * He kicked me here' (on side) and it hurt her arm and her eye. I told her, 'You will be all right in the morning;' and she said, 'No,' I am afraid.'"

It will be observed that the theory of death by internal rupture adopted by the doctor had been accepted by the deceased and the parties Reno and Mulock, and in each instance she was asked who inflicted the external injuries, and she made the statements. Dr. Bilby stated that if the autopsy showed that there was no internal rupture: "*I would, of course, have to give up that I was wrong.*"

The autopsy showed conclusively no rupture; no connection whatever between the external injuries and the cause of death; hence the theory of Bilby was exploded and the

supposed dying declarations were inadmissible, pertaining to facts entirely independent and in no way connected with the cause of death. The alleged declarations made to Bilby were clearly inadmissible from the fact that they were made on the morning of the 29th, when he was giving her a hope of living, and the only evidence she gave of expected death was that she informed him that he could do her no good and need not return. Thirty-six hours afterwards he informed her there was no hope, and she realized the fact of impending death; but the declarations were not repeated, and he admitted that the two interviews had been combined. The alleged declarations testified by Reno were clearly inadmissible for another reason than the one stated above. To be admissible, the condition of the person must be shown, that there was sufficient consciousness and intelligence to comprehend and intelligently answer the questions. She did not speak; simply nodded her head. "She was in very low condition." There is no evidence of sufficient consciousness to comprehend the questions asked.

Mulock's evidence was inadmissible, as it only pertained to the external injuries, and the alleged statement of the deceased " My husband has killed me," was clearly inadmissible. It was her opinion based upon that of her attending physician and perhaps others. Opinions in dying declarations are never admissible. 1 Greenl. Ev., sec. 159 ; 1 Bish. Cr. Proc., sec. 1211.

From what has already been said it will be apparent that the jury was misled by the improper evidence admitted and by the instructions of the court giving undue and unwarranted importance to the theory of the prosecution, persisted in and permeating the whole trial, which common justice required to be abandoned on the incoming of the evidence in regard to the *corpus delicti*. As already shown, the evidence must have been such as to absolutely establish the death resulting from violence and clearly negativing the possibility, or, at least, probability of death from natural causes. The testimony clearly showed that the cause or causes of death were

entirely disconnected from the external injuries. The cause or causes of death were not obscure, but patent—alcoholism, exposure, and exhaustion. After the supposed injuries were received and the supposed rupture of internal organs occurred, over two weeks had elapsed, during which, according to the statement made by her husband in her presence, and acquiesced in by her, she had been on a "prolonged spree," had consumed two gallons of liquor, had taken no nutrition. According to the evidence of the attending physician, by the use of alcohol, or some other agent, the lining membrane of the mouth and throat had been destroyed, turned white, as if burned by carbolic acid. Bright's disease may have been an important factor, but an unnecessary one. The history of the woman's habits for two years and the uncontradicted evidence established more natural causes of death than were necessary, without Bright's disease.

In their periodical drunken conflicts she was, undoubtedly, the victim of violence and abuse. The external injuries, if inflicted by him, may have affected more or less a person in her prostrate condition, but there is an utter want of evidence that they caused death. As to how they were received is left equally in doubt; may have been caused by the husband, or by falling over furniture in the house; when she fell down cellar; when she fell in the yard or in the ravine. Her own unfortunate habits, as shown, were such that the external injuries might readily have been the result of her own accidents.

One instruction (Number 20½) is particularly objectionable. It is: "The fact, if it be a fact, that the defendant fled from the neighborhood in which he was living *at the time* of the commission of the alleged offense, is a circumstance proper to be considered by you in connection with all the other circumstances proved upon this trial."

There was no evidence in its support; was at variance with the testimony. He was with his wife and doctor on the morning of December 28th, informed the doctor he was going away. The supposed injury was inflicted two weeks

or more before that time. All the evidence there is, is to the effect that he went by the advice of the wife to avoid arrest for the sale of liquor without a license, and only went into an adjoining county, the distance of a few miles. The family knew where he was. The boy testified: "Mother died December 31st, at night. Father was at Houston's. He went Monday morning."

In view of the entire evidence as discussed above, several of the instructions should not have been given, but it is unnecessary to review them. The other assignments of error need not be considered. For the causes stated the judgment must be reversed.

*Reversed.*