No. 14,314.

CLARK *v.* THE PEOPLE.
(86 P. [2d] 257)

Decided January 3, 1939.

Mr. Joel E. Stone, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. Reid Williams, Assistant, for the people.

*En Banc.*

Mr. Justice Francis E. Bouck delivered the opinion of the court.

The plaintiff in error, J. W. Clark, was convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for not less than ten years and not more than twelve years. He brings the case here for review.

Clark is a chiropractor. The district attorney charged, and undertook to prove, that the death of a young unmarried woman, Miss B. P., was due to an abortion claimed to have been performed by Clark on May 4, 1936, after she had become pregnant by a young unmarried man, J. J. M. It is uncontradicted that after becoming pregnant B. P. had herself taken several doses of a medicine supplied to her by J. J. M. for the purpose of producing a miscarriage, as a result of which she had become very weak and ill. Clark admitted that she came to his office, but he denied performing an abortion, saying that on the contrary he advised her to reveal her condition to her mother, that he tried to dissuade the deceased from seeking an illegal operation, and had urged her to marry the young man instead.

One of the errors assigned in support of reversal is the admission of J. J. M.'s testimony that a week or two before May 4, the date of the alleged operation, he had had a conversation with B. P. in which she told him "she was pregnant and she was going to have an abortion performed by Dr. Clark." Whatever the conversation was, it was held out of the defendant Clark's presence and hearing, and was prior to the time she first met Clark or talked to him, and long before Clark learned of the case. This testimony could not be received under any recognized exception to the hearsay rule, an attempt to qualify it as the declaration of a coconspirator being obviously futile, there being no evidence in the record concerning the existence of any conspiracy which he could have joined at that time. Its admission constituted reversible error.

Error is also assigned on the admission of testimony given by Dr. Currigan. He testified that the deceased told him the day before the alleged abortion she was determined to have the operation performed. Further: "She said she thought she could have it done, and I asked if it was any of my business if I were to ask her who was going to do it. And she said, 'Well, I am going to have it done; I don't see why I should say.' I said, 'All right,' and she said, 'Dr. Clark in the Empire Building. Dr. Clark, a chiropractor.' " Again, he testified that she made no statement as to the arrangement, but that "she was just going on through with it." He also testified that six days later he called upon her at her home and, "She says, 'Well, I had that done and I have been pretty bad'," no mention being made of the person who might have done it. Later he stated: "As I remember, her statement [in the afternoon, at the hospital to which Dr. Currigan had her removed] was to the effect that she had asked Dr. Clark to do this work on her and that he had done it," but that she did not tell him how much she paid. There is in evidence a typewritten document, purporting to be signed by B. P. at the hospital about May 12, 1936, to which due

objection was made, and which will be later discussed. Dr. Currigan thereupon testified: ''She said 'I went to *this man's* office and *they* gave me some other medicine','' but he said she did not state *where* she went. ''She said: 'I went to *their* office * * *' that is what she said, she didn't mention any name.'' (Inasmuch as Clark's codefendant Carter, who shared offices with him was acquitted by direction of the court, the testimony quoted takes on a dubious aspect.)

Dr. Currigan was asked on re-direct examination by the district attorney as follows: ''You testified that B. P.,— on cross-examination, that you curetted her—will you state to this court and jury whether or not in the performance of that curettement, whether you punctured the uterus in two places, of B. P.?'' The answer was: ''I had no knowledge of such fact *if I did.*'' A curette, as a surgical instrument, is defined by Webster's New International Dictionary (2nd Ed., Unabridged) as ''a scoop, loop or ring (either blunt or sharp) for removing foreign bodies, growths, etc., from the walls of a cavity.'' That an accidental puncturing of the walls of the uterus in the course of a uterine curettage might well have brought about the condition found by Dr. Thorsness, the coroner's physician, at the autopsy after B. P.'s death, without the defendant Clark's performing any operation whatever, is obvious on the record herein. Such a possibility seems strengthened by the state of the evidence herein. Thus (1) there is not an iota of evidence that the defendant had in his possession or used at any time an instrument which could be used for an abortion, but, on the contrary, it is shown that chiropractic forbids the use of instruments by its practitioners. (2) There is no evidence of the slightest admission by the defendant that he performed such an operation, and there is, on the contrary, considerable corroboration in the testimony of the people's witnesses as to his account of what was said to and by him and what he did, indicating his innocence. For example, the defendant

claimed that when he was first contacted in connection with the case, about May 1, 1936, by the witness Margaret Mills, who said to him that she was of the impression that the Dr. Clark she wanted to see was a much older man, he stated that there were a number of Dr. Clarks, including an older one; that, when she said the doctor she was thinking of would help girls out of trouble, he told her she had the wrong doctor because he was a chiropractor and there was nothing chiropractors could do to help girls out of trouble inasmuch as they did not use any instruments or drugs; that she said it was not herself who was in trouble, but a friend of hers, and asked him whether he could refer her to someone, and that he told her he knew nothing about it and would refer her to no one. As to these and similar statements the defendant was largely corroborated by the witnesses Mills and Miss Conover (another people's witness). (3) There is no evidence of a former criminal operation by the defendant nor of any attempt at one. (4) The witnesses Mills and Conover each denied that the deceased had ever told her that Dr. Clark had performed an abortion either with drugs or with instruments.

Of course any statement by B. P. of her intention to have a criminal operation performed by the defendant, even if it were admissible, could not prove the actual performance of such an operation by him. So far as the record shows, there is no evidence that any witness knew of the alleged operation at first hand, nor any evidence that the deceased ever told anybody other than Dr. Currigan that the alleged operation was actually performed by the defendant, and such a statement, being purely a narrative, as we show, is not admissible under any exception to the hearsay rule.

Dr. Currigan testified that on May 9, 1936, B. P. told him in the presence of an interne about the performance of an operation, but he also stated that nothing was said in his hearing about the payment of any money.

The typewritten document, already referred to, was identified by the interne as signed by B. P. in his presence, but in the absence of Dr. Currigan, three days later. The interne testified that the document was read to B. P. by one of the Sisters of Charity; he does not remember which one, but she was out of the city at the time of the trial. The document seems not to have been discussed at all at that time. It was not identified by the person who did the typewriting, which occurred elsewhere than in the room occupied by B. P. Objection was made on the ground of the failure so to identify it. Who drafted it does not appear. But the statements, oral and written, being made respectively five and eight days after the alleged operation, cannot be deemed admissible as part of the res gestae; they appear as mere narratives long after the alleged operation.

█ It seems equally clear that neither the typewritten document nor the oral statement alleged to have preceded its preparation is admissible as a dying declaration. There is no indication that the doctors themselves had given up all hope of recovery, nor does it appear that whatever statements were given were actuated by anything other than the urging of a doctor as a mere matter of routine. Neither of the two statements satisfied the requirements of the rule as to the admission of dying declarations.

█ Neither can there be any contention that the oral statement of May 9 and the document of May 12 were admissible as statements of a coconspirator of the defendant. Assuming, but not deciding, that there is evidence tending to show that they were coconspirators, we find that the crime assigned as the sole object of the supposed conspiracy, if committed at all, must have been completed for a period of days when the statements are said to have been given. If it be argued that statements made to Dr. Currigan are admissible under a supposed rule permitting a patient to give a history of his or her case, we must

remember that such statements are admissible only in so far as they relate to the patient's symptoms and condition, but that statements concerning the question of responsibility for an injury or physical condition are inadmissible. *Lowery v. Jones,* 219 Ala. 201, 202, 121 So. 704, 706, 64 A. L. R. 553, 555-6 (see also top of p. 564 of Annotation). The responsibility cannot be fixed in this roundabout way as a substitute for legal evidence that is not available.

The defendant also assigns error on the court's rejecting offers of proof by the witness Spencer and the witness Caraghar to show that on May 4, 1936, just before the trip alleged to have been taken by B. P. to the office of the defendant, the deceased made certain statements to them respectively. Some of the evidence offered was admissible and its rejection therefore error, but a discussion of it does not seem called for here.

Other errors are assigned; but, since the judgment must be reversed, it is unnecessary to carry the discussion of those errors farther. If another trial is had, it must proceed in harmony with this opinion.

Judgment reversed.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE BAKKE dissent.