## No. 15,220.

### Cobianchi *v.* The People.
(141 P. [2d] 688)

Decided August 3, 1943.   Rehearing denied October 4, 1943.

Messrs. ALTER & UPTON, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAW-RENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE YOUNG delivered the opinion of the court.

DEFENDANT was charged with murder by abortion, convicted of second degree murder, and sentenced to a term in the penitentiary. To reverse the judgment he prosecutes a writ of error.

Defendant introduced no testimony. At the close of the people's case, he moved for a directed verdict on the ground that the evidence was not sufficient to support a conviction. The court denied the motion. The assignments of error are directed to: 1. Refusal by the trial court of instructions tendered by defendant and giving of instructions over defendant's objection; 2. refusal to strike certain allegedly incompetent and irrelevant testimony; and 3. denial of defendant's motion for a directed verdict.

In the view we take, it is unnecessary to consider the first and second groups of assigned errors, and we therefore express no opinion as to their merits or demerits. We consider only the error assigned on the court's denial of the motion for a directed verdict. This raises the issue of whether a prima facie case of defendant's guilt was established by competent evidence. The evidence is wholly circumstantial. The circumstances relied upon are as follows:

On October 1, 1941, the deceased, Geraldine, suspecting that she was pregnant because she had missed two menstrual periods, called on Dr. Holt and requested an examination. He gave her a bottle, with directions to

procure and bring to him the next day a sample of her urine. She returned as directed, and presented what Dr. Holt assumed was a sample of her urine, though he had no knowledge of that fact. This sample Dr. Holt delivered to Miss Spraley, a laboratory technician employed by Dr. Halley, to make the Friedman modification of the Zondek-Ascheim test. This is done properly by injecting a quantity of the urine of the woman suspected of pregnancy into the blood stream of a virgin female rabbit that has been kept away from proximity to a male rabbit, and which is from four months to seventeen weeks old and weighs about four pounds. Forty-eight hours after such injection the rabbit is killed, and its ovaries examined. If the woman is pregnant, certain changes in the appearance of the rabbit's ovaries ordinarily occur, discernible to one skilled in making such tests. If the woman is not pregnant, ordinarily no change is produced in the appearance of the ovaries. This test was made, and Dr. Halley's report was that the result was positive.

According to the medical testimony, the test is not absolute, but in ninety per cent of the cases it proves to be correct. Dr. Holt could not state definitely that the sample of urine presented to him was that of Geraldine, nor did any other witness so testify. His testimony was that she presented it to him as such. Neither Dr. Halley nor his technician was able to state positively, nor did any other witness testify, that the rabbit used for the test was of the age or weight required, that it was a virgin rabbit, and if so, that it had not been in proximity to a male rabbit. It was admitted that if the rabbit was not a virgin, or if so, and it had been in proximity to a male, that its ovaries would have the appearance noted and that the test would be positive, even if deceased was not pregnant. It was further admitted that if deceased had a certain kind of tumor the test would be positive even though pregnancy did not exist, and that many other physical conditions of the woman might

destroy its accuracy as a test. There was no testimony that deceased was not afflicted with such a tumor, nor testimony excluding any other possible conditions that might make the test inaccurate.

Dr. Dwyer testified that he examined Geraldine at St. Luke's Hospital on October 21, 1941, at which time she stated to him that she had attempted an abortion on Saturday, October eleventh, and that a doctor whose name she did not state, had curetted her on the following Sunday, October twelfth. The medical testimony was to the effect that curettement is the proper proceeding following an abortion. Dr. Dwyer's examination disclosed a pelvic abscess that might be caused by an abortion, but from an examination of the organs of deceased he discovered nothing to indicate that pregnancy had existed or that an abortion had been performed. He stated that if Geraldine had been pregnant, he would have gotten some sort of placenta tissue, and this he did not find. Dr. Dwyer's testimony was to the further effect that he did not know the cause of the pelvic abscess; that an abortion could cause one, but that it could result from many other causes and that it was not peculiar to a female, but might be found also in a male.

Deceased remained in St. Luke's Hospital three weeks under Dr. Dwyer's care, returned to her apartment where she remained for two weeks, and then entered St. Joseph's Hospital where Dr. Dwyer operated on her for acute appendicitis. This, according to the medical testimony, might have resulted from the abortion, or abscess, or from many other causes, and the septicemia which caused her death a few days after the operation could have been a post-operative result of the operation for acute appendicitis. In the death certificate, Dr. Dwyer stated that death was from septicemia "due to instrumentation to perform an abortion, or something like that." Due to the fact that Geraldine stated she had had an abortion, and not to anything he found from his ex-

amination, Dr. Dwyer so reported the cause of death. For the same reason he caused the district attorney to be notified, and two investigators from that office interviewed Geraldine, but no action, so far as the record discloses, was predicated on their investigation, and neither of them was a witness in the case.

The autopsy performed by Dr. Maynard, pathologist for the City and County of Denver, revealed an acute inflammation of the uterus and ovaries, and that death was caused by generalized peritonitis. It disclosed no evidence of pregnancy or of an abortion.

Jack Fixler, a witness for the people, testified that Geraldine was his fiancee; that she lived in the Glenaire Apartments at 1431 Glenarm Place, Denver; that he knew Dr. Cobianchi, defendant; that the first time he talked to him was in the place where he worked, and the second time he talked to him was at the Glenaire Apartments where Geraldine was sick in bed. On the latter occasion he talked to her in the presence of defendant at which time he says she told about her condition, but he does not state what that condition was, other than that she was sick at that time. He testified that defendant told him not to worry, that Geraldine would be well taken care of, and that everything would be all right. Witness says he asked for a different doctor and found Dr. Dwyer, who took her to St. Luke's Hospital, as hereinbefore stated. The witness also testified that after Geraldine returned to her apartment from St. Luke's Hospital, Dr. Cobianchi visited her there, to his knowledge "once or twice;" that witness was there present on one such occasion. He further stated that defendant asked to be called by the name of "James" because he feared his telephone wires would be tapped; that defendant, after Geraldine's mother arrived, would call the witness at the hotel to learn of her condition. Witness testified that after Geraldine died he took a long ride with defendant who felt badly over her death and told him what a fine girl she was and also "that

was the first case he lost in his practice." He asked witness how much money he had spent, and on being informed that he had spent $25.00, he gave this amount to witness, stating that "he was with me one hundred per cent; we were brothers from now on, and just to stick to my story—he said he would be called in front of the officers and investigated—that Geraldine done the job herself. We had dinner together that night. He did not want to be seen down town with me and we had dinner on Broadway." Witness testified further that defendant paid $17.00 for Geraldine's apartment, $35.00 to her mother, and gave the witness $35.00, and told him that he was leaving for an operation and would write witness a letter, but that he did not do so. After a recess, witness was again called to the stand, and in response to the question, "What did he say?" answered, "He [referring to defendant] said it was the first case he had lost in twenty-five years of abortion."

Witness Burr, a practical nurse who attended Geraldine for a week after her return from St. Luke's Hospital, stated that, "There was a man came there who was introduced to her as Henry, and whom she learned to be Dr. Cobianchi." This man, she stated, telephoned every day while she was there, and inquired about Geraldine's condition. The foregoing is a digest of the state's testimony.

■ We are of the opinion that the evidence in this case is insufficient to support the charge laid in the information for the reason that it does not establish one thing vital in every criminal case—a corpus delicti. The corpus delicti in a murder case requires two elements, each of which must be proved: (1) Death as the result of an act performed, or a wound inflicted; (2) that such act was unlawfully performed, or such wound was unlawfully inflicted by another. *McBride v. People,* 5 Colo. App. 91, 37 Pac. 953; *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204; 30 C.J. 287. In the Ausmus and Moon case we quoted with approval the following lan-

guage from *People v. Bennett,* 49 N.Y. 137: "The corpus delicti has two components, viz.: death as the result, and the criminal agency of another as the means."

■ Proof that there was an abortion requires as a prerequisite, proof of pregnancy. The statement of the evidence which we have set forth, shows that on this point it might be questioned whether the proof is such as to justify the conclusion that pregnancy existed beyond a reasonable doubt. The proof of this fact depends wholly on the so-called rabbit test, which admittedly is accurate in only ninety per cent of the cases where it is made. No expert medical testimony is pointed out to us and we find none to the effect that pregnancy existed; but, assuming that deceased was pregnant, the proof of the second element of the abortion charged, namely, that it was produced by an instrument in the hands of another, is even more doubtful. The only direct information in the evidence that an abortion was brought about, as to who occasioned it, and as to the means used, is found in the testimony of Dr. Dwyer that deceased told him she had used a catheter and attempted to bring about an abortion on herself, and had had a curettement by a doctor, unnamed, the next day. None of the examinations by the doctors revealed physical evidence of pregnancy, or of an abortion. They so testified, and Dr. Dwyer stated that if there had been a pregnancy and an abortion, he would have found placental tissue. This testimony falls far short of being sufficient to sustain a verdict that death was caused by an abortion procured and caused by an instrument in the hands of defendant — one of the essentials of the corpus delicti of the crime charged.

■ At this point it is pertinent to observe that in the case of *Clark v. People,* 103 Colo. 371, 86 P. (2d) 257, we said: "If it be argued that statements made to Dr. Currigan are admissible under a supposed rule permitting a patient to give a history of his or her case, we must remember that such statements are admissible

only in so far as they relate to the patient's symptoms and condition, but that statements concerning the question of responsibility for an injury or physical condition are inadmissible. *Lowery v. Jones,* 219 Ala. 201, 202, 121 So. 704, 706, 64 A.L.R. 553, 555-6 (see also top of p. 564 of Annotation). The responsibility cannot be fixed in this roundabout way as a substitute for legal evidence that is not available." This seems to be in line with the holding of other well-reasoned cases: *Commonwealth v. Dawn,* 302 Mass. 255, 19 N.E. (2d) 315; *State v. Donnell,* 128 Me. 500, 148 Atl. 747; *Commonwealth v. Sinclair,* 195 Mass. 100, 80 N.E. 799; Wigmore on Evidence (1st ed.), vol. 3, p. 2217, §1722; *State v. Gruich,* 96 N.J.L. 202, 114 Atl. 547, and *People v. Bray,* 42 Cal. App. 465, 183 Pac. 712. In line with the foregoing, testimony of a statement by Geraldine to her physician as to the person responsible for her physical condition, is hearsay and incompetent. Such being the case, her statement that a doctor curetted her, while possibly the act of currettement might be information necessary to determine proper treatment, does not authorize the inference that the defendant did even this, or that there was any criminality on the part of anyone involved in that operation.

The next logical inquiry is whether there is sufficient other testimony to warrant a submission to a jury of the question of whether or not defendant procured or caused an abortion of deceased. The only other testimony is that of Jack Fixler and the nurse Burr, who attended deceased for a week after her return from St. Luke's Hospital. The nurse testified that she was introduced to a person who called on Geraldine, as "Henry," and that she afterwards learned the person was Dr. Cobianchi. Who was the mover in his being so introduced, whether defendant or Geraldine, is not indicated. She stated Dr. Cobianchi asked her to leave the room while he talked to Geraldine. Jack Fixler testified that Geraldine was his fiancee; that he was at Geraldine's apartment once when Dr. Cobianchi was there; that

after Geraldine's mother came, Dr. Cobianchi called him to ascertain Geraldine's condition, using the name of "James" because he, defendant, stated he was afraid his telephone would be tapped and that he would be investigated by the officers. After Geraldine's death, defendant was very much upset and told Fixler, as the latter testified, that this was the first case he had lost in his practice, and, after a recess by the court, witness testified that defendant said this "was the first case he had lost in twenty-five years of abortion." Fixler further testified that defendant told him they "were brothers from now on and to stick to my story * * * that Geraldine done the job herself." Whether they were brothers in respect to responsibility for an abortion, or for her antecedent condition that caused her to produce the abortion or have it produced, is matter of speculation only. Fixler testified that defendant insisted on reimbursing him for $25.00 he had expended, paid $17.00 rent on Geraldine's apartment, and gave her mother $35.00.

It may be conceded that these are circumstances that tend to cast a suspicion on defendant as having some feeling of responsibility for Geraldine's condition. The fact that the witness Fixler, with knowledge of the fact of her pregnancy, as may be inferred from his testimony, had expended $25.00 in behalf of a girl that he says he expected to marry, might imply some feeling of responsibility on his part for her condition. Similarly, defendant's solicitation for Geraldine's welfare is explainable on a reasonable theory other than that he had caused an abortion for her. So far as the record is concerned, there is not a word of testimony in it establishing that defendant is a physician and surgeon. Assuming that he is, and was at that time, even the statement that he is said to have made, that this was the first case of abortion he had lost in twenty-five years, is not in and of itself an admission of guilt, for it is a well known fact that cases of abortion from accident, other causes and

self-inflicted, as deceased said this one was, are not infrequent and that their aftermath requires the services of a physician and surgeon. The statement of a physician that he had never lost a case of abortion in twenty-five years is certainly not the equivalent of a statement that he had been producing abortions for twenty-five years, that he produced one on Geraldine and that she was the first patient who had died from the effects of an abortion procured by him. A physician who merely performed a currettement, and there is not a suggestion in this record that any more than this was ever done by any physician, might say without a necessary implication of criminality, even if the patient died, that he had never before lost a case of abortion. The circumstance indicated by the statement attributed to defendant, while consistent with guilt, is equally consistent with innocence. There can be no question that when such is the fact and circumstantial evidence alone is relied upon, that a circumstance or circumstances consistent with guilt but equally consistent with innocence, does not constitute sufficient proof to sustain a conviction. Furthermore, the evidence that the abortion caused the death of Geraldine, even if one was produced, is far from conclusive. Death resulted from septicemia, or as the autopsy disclosed, from generalized peritonitis; but of this, the pelvic abscess, which could be, but which may or may not have been, caused by an abortion and which is not peculiar even to the female sex, was an adequate cause. Likewise, the post-operative effects of the appendectomy for acute appendicitis, which might be caused, according to the medical testimony, from the abscess, or from many other causes, was an adequate cause for the peritonitis that resulted in Geraldine's death.

While we recognize the difficulty of obtaining proof of the crime of murder by abortion, accompanied as the act generally is, with secrecy that prevents direct testimony by any but the guilty participants, the lips

of one of which are sealed by death, and the lips of the other of which may not be opened if refuge is taken in constitutional immunity from self incrimination, this is not grounds for our overturning the rules of evidence that are coeval with the common law, designed and effective for the protection of the innocent. If they result on occasion in the guilty escaping a just penalty, that must be ascribed to the imperfection of the law, which like all human institutions is permeated with human imperfections. Bearing in mind the difficulty of proof and possibility of the guilty escaping punishment, we are of the opinion, nevertheless, that the judgment in this case must be reversed for failure of the people to prove by competent evidence the corpus delicti: "death as the result, and the criminal agency of another as the means." *Ausmus and Moon v. People, supra.*

Judgment reversed.

MR. JUSTICE BURKE and MR. JUSTICE JACKSON dissent.

MR. JUSTICE BURKE.

I dissent. I think inferences from the evidence were for the jury and we cannot say they were improperly drawn. I think the Court usurps the province of the jurors and substitutes its own inferences for theirs.