# No. 15,661.

## KIRSCHWING, MANAGER OF SAFETY AND EXCISE OF THE CITY AND COUNTY OF DENVER ET AL. *v.* FARRAR.

(166 P. [2d] 154)

Decided January 28, 1946.

Mr. MALCOLM LINDSEY, Mr. CARL C. HEARNSBERGER, Mr. FRANK L. HAYS, for plaintiffs in error.

Mr. O. OTTO MOORE, for defendant in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

DEFENDANT in error, Farrar, employed as a police officer of Denver for approximately eighteen years, was dismissed by Robert J. Kirschwing, manager of safety and excise of the City and County of Denver, for having been under the influence of intoxicating liquor while on duty March 2, 1944. On his petition for review and appeal from the findings of the manager of safety, the Civil Service Commission of the city and county sustained the dismissal. Farrar thereupon instituted this action in the Denver district court, and after a trial to the court, an order was entered reinstating Farrar on the ground "that there was a failure in the proof * * * to sustain the charges made against plaintiff." The manager of safety comes here on writ of error, asking for supersedeas and also that the case be determined on the supersedeas application. We have elected so to dispose of it.

The evidence shows that Farrar, a patrolman first class in the Denver police department, was found by

other police officers on or about midnight March 2, 1944, in full uniform, at a time when he was on duty, at the corner of 17th and Larimer streets, Denver, in an unconscious condition. He was lying face downward; had a large bruise on one cheek; there was a skin abrasion on his chin, and the pupils of his eyes were widely dilated. His superior officer, Captain Raedel, was summoned, and, under his direction, Farrar was picked up and taken to the police station and later to the Denver General Hospital where a blood alcohol test was made, also pursuant to Captain Raedel's direction. The result of this test disclosed "Alcohol 3.9 mg. per cc of Blood," which, according to the evidence, is considered sufficient in most humans to induce a high state of intoxication. The police officers who had either discovered Farrar in an unconscious condition or had participated in taking him to the police station, and subsequently to the hospital, testified on the hearing before the manager of safety that they did not believe he had an "alcoholic breath." Captain Raedel's testimony was, "I found an odor of some foreign substance, wasn't liquor." Dot Malone, head nurse, emergency room, Denver General Hospital, testified, "There was an odor, but I couldn't tell what it was." Dr. Crum, who withdrew the blood for the alcohol test, testified that he did not notice any odor of alcohol on Farrar's breath, but believed he was drunk.

Farrar's defense was that at about the midnight that ushered in March 2, 1944, he was suffering from an epileptic seizure of the grand mal type; that he had become unconscious once before just after going off duty the morning of December 16, 1943. There was evidence to show that he had been ordered not to drive a car, and that other police officers always took the driver's seat when they started out with him in police cars.

The trial court's reversal of the police commissioner and the Denver Civil Service Commission was founded on its belief that their respective actions were based on

the blood alcohol test; that the proof of that test was inaccurate; that it was open to the faults which were held to exist in *Cobianchi v. People,* 111 Colo. 298, 141 P. (2d) 688. It therefore relied on the testimony that there was "no liquor" on Farrar's breath, either at the time he was picked up at 17th and Larimer streets or at the time the blood was alleged to have been taken from him at the Denver General Hospital, and held that the manager abused his discretion and "that there was a failure in the proof offered."

Kirschwing and the commission specify that the trial court erred: (a) In holding that Kirschwing and the commission acted arbitrarily and capriciously in discharging Farrar; (b) in holding that the charges against Farrar were not substantially supported by the evidence and there was a failure of proof to sustain the charges against Farrar; (c) in ordering the restoration of plaintiff to the status of patrolman first grade in the classified service of the City and County of Denver.

◼ The blood alcohol test has been upheld in two recent cases. *State v. Cram* (Ore.), 160 P. (2d) 283 (June 19, 1945), was a criminal case in which the defendant unsuccessfully urged a constitutional objection to the use of the blood alcohol test. Simultaneously, in *Hanlon v. Woodhouse,* 113 Colo. 504, 160 P. (2d) 998, we had before us a civil action for damages as a result of an automobile collision in which evidence was introduced of a test for alcohol in the blood of defendant, who had been taken to a hospital and, while still unconscious, blood was withdrawn from his veins "to be tested for blood alcohol" at the request of a public officer who had been summoned to the scene of the accident. Both the physician in charge and the laboratory technician testified that the analysis showed sufficient blood alcohol to cause a state of drunkenness in the average person. Objection made at the trial to the admission of the evidence was overruled by the trial judge, and we sustained that ruling. There the objec-

tion was on the ground that the confidential relation between physician and patient had been violated.

In 127 A. L. R. 1513, and 159 A. L. R. 209, appear interesting annotations on "admissibility and weight of evidence based on scientific test for intoxication or presence of alcohol in system."

In the instant case the objection to the blood alcohol test is made on the ground that it was subject to the same objection as the test for pregnancy which was before us in *Cobianchi v. People, supra.* In that case the doctor could not state of his own knowledge that the urine used in the test was that of the deceased. In the instant case we have the testimony of the doctor who actually withdrew from Farrar's veins the blood that was used in the test. In the Cobianchi test some of the deceased's urine was injected into the veins of a female rabbit, and the doctor in charge testified that, from the inspection of the rabbit's ovaries twenty-four hours later, the result of the test was positive; *but on cross-examination,* it appeared that none of the witnesses could state positively from his or her knowledge that the rabbit used for the test was (1) a virgin, (2), if so, that it had not been in proximity to a male rabbit, (3) that it was within the required age limits, and (4) of the proper weight. It was admitted that all four conditions had to exist to make the test complete. Furthermore, it was brought out that, although the rabbit used fulfilled all four requirements, the test even then was not absolute proof of pregnancy because a gonadial tumor would cause the same reaction as pregnancy and there was no testimony that deceased did not have such a tumor. In addition to all of the foregoing, the physician, who had been called in after the alleged abortion and had curetted deceased, testified that he found no placental tissue which he would expect to find after an abortion. We accordingly held that the fact of pregnancy, which was a prerequisite to a conviction of murder from abortion, had not been established.

In the instant case, in addition to the testimony of the doctor who withdrew the blood, there is the testimony of his assistant who held the test tube into which Farrar's blood was poured and who then made a record on the hospital's printed form on which she filled in the date, time of withdrawal, name, and who requested the examination, the doctor's name who drew the blood, and the laboratory technician's name. She then marked the test tube containing Farrar's blood and put it in an ice box which was padlocked and to which she and the laboratory technician at the hospital had the only keys. The laboratory technician testified that she made an examination of Farrar's blood and that the result of this test showed the presence of "3.9 mg. per cc of blood." Farrar's counsel, although cross-examining the laboratory technician as to her qualifications as a witness, did not cross-examine either in respect to the nature of the blood alcohol test which she conducted or as to how she identified the fact that it was Farrar's blood which she analyzed. No objection was made to the introduction of the testimony involving the blood alcohol test, either in the hearing before the commissioner or before the Civil Service Commission. It is apparent that the part of the record in the Cobianchi case which laid the basis for reversal in this court was the cross-examination which brought out the lack of accuracy in the pregnancy test as applied to the particular circumstances in that case. Objection was there made to the admission of that testimony relating to the pregnancy test. In the instant case no objection was made to the introduction of the testimony relating to the blood alcohol test either in the proceedings before the police commissioner or before the Denver Civil Service Commission. It also should be noted that the Cobianchi case was a criminal case in which proof of guilt had to be made beyond a reasonable doubt; whereas the instant case is a civil proceeding. There having been no objection made to the introduction as

evidence of the results of the blood alcohol test and no attempt by cross-examination to attack its accuracy, we do not feel justified in considering this question on review.

In order to be sure that this rule — forbidding consideration of a point not appearing in the record — would not work an injustice, we have studied the nature of blood alcohol tests as they have been set forth in this and other cases. Unlike the pregnancy test in the Cobianchi case, which might be described as a biological test involving the necessity for careful and accurate controls *outside* of the laboratory, the blood alcohol test in the instant case is a purely chemical one with all of the controls directly under the supervision of the three witnesses who testified as to having participated in the test. Farrar's counsel failed to bring out by way of cross-examination any possible chances of inaccuracy that might exist in the various methods for testing the presence of alcohol in the blood that defense counsel in the Cobianchi case took such pains to disclose in respect to the pregnancy test.

We have been unable to find any case where the blood test to determine intoxication has been excluded because of its unreliable value as proof. In the leading article in the January 1939 issue of the Iowa Law Review, volume 24, page 214, Professors Mason Ladd and Robert B. Gibson made the statements that up to the time of writing no such case had been reported.

Farrar's defense is that the condition in which he was found at 12:15 a.m. on the morning of March 2, 1944, was due to an epileptic seizure commonly described as a grand mal, as distinguished from a less severe seizure sometimes called a petite mal. Farrar's counsel assert that if the blood alcohol test be disregarded that every other bit of evidence is consistent with the theory that Farrar was not under the influence of alcohol. The testimony of Dr. Crum, somewhat weakens counsel's assertion. He stated that the pupils

of Farrar's eyes at the time of examination were widely dilated, that his pulse and his breathing were rapid. He then testified on redirect examination that such a condition of the eyes and pulse was more indicative of intoxication from alcohol than of an epileptic seizure.

The greatest emphasis is made by Farrar's counsel on the fact that there was no testimony indicating that Farrar, at the time he was picked up unconscious or at the time of the examination for blood alcohol in the hospital, had an odor of alcohol on his breath. Counsel makes the challenging statement: "We observe at this point that no man, ever in the black history of alcohol, has yet arrived past the 'staggering' stage of drunkenness without radiating the odor of alcohol."

No evidence is offered in support of this contention and there appear to be obvious conditions where, with a high degree of intoxication existing, the odor of alcohol on the breath is not present, such as : (1) where it has been disguised by the separate use of deodorants; (2) where the person imbibing has developed a condition of acidosis, in which case the breath takes on the peculiar odor of a person suffering from acidosis; (3) where the alcoholic drink has in it a flavor that tends to blot out or modify the typical alcoholic breath. See: W. D. McNally, Toxicology, 1937, Industrial Medicine, p. 657; Drunkenness, A Quantitative Study of Acute Alcoholic Intoxication, E. Bogen (1927) J.A.M.A. 89, 1508; Alcohol and Man by Haven Emerson, The MacMillan Company, New York, 1933, p. 138.

Nor does the testimony that Farrar's breath had a distinctive odor, but not alcoholic, support the diagnosis of epilepsy, as seems to have been tacitly assumed by his counsel. We have carefully studied a number of works on epilepsy, including four recent studies, i. e.: Science and Seizures, by Will G. Lennox (1941); Convulsive Seizures and How to Deal With Them, by Tracy Putman (1943); Epilepsy and Cerebral Localization, by Penfield (1941); The Falling Sickness, by Temken

(1945). Nowhere can we find any indication or reference to the fact that a distinctive odor of the breath either precedes, accompanies, or follows a seizure of the grand mal or petite mal type.

The testimony concerning the odor of Farrar's breath, therefore, would appear to be negative in its nature. It does not conclusively prove that he was not intoxicated. At the same time it does not support the theory that he had suffered from an epileptic seizure.

The inconclusive character of evidence relating to the odor of alcohol on the breath has led to the development of more objective tests — probably the commonest of which at the present time is the blood alcohol test. As has been noted, use has been made of it by officers of this state, as well as by the Denver police department. Its use is the subject of legislation in some states. And in Sweden, at least prior to World War II, every member of the police department having to do with traffic regulation seems to have been equipped with apparatus for obtaining and saving, for the purpose of subsequent testing, a certain amount of the blood of any driver of a car involved in an accident. Iowa State Bar Journal (id.).

██ Counsel for defendant in error, Farrar, makes a cross-specification of error which, because of our disposition of the case, requires our consideration.

Counsel offered in evidence to the trial court correspondence between the secretary of the Denver Civil Service Commission and Dr. Herman A. Heise, of Milwaukee, Wisconsin, in which the former wrote the latter about the status of the instant case while it was still pending before the commission, and asked for the latter's comments. Doctor Heise, in the course of his letter replying to that of the secretary of the Civil Service Commission, remarked that "it is obvious that the defense is trumped up." The stenographer who typed the outgoing letter and who was in charge of the files of the commission and who was the witness called by

Farrar's counsel to identify the correspondence, testified that so far as she knew the correspondence had been entered into by the secretary of the commission on his own motion, and she did not know whether the members of the commission had seen it.

The admission of this correspondence in evidence was objected to by counsel for the commission on the ground that it was not proper evidence, and the objection was sustained. We believe this ruling of the trial court was correct.

■ As to the final disposal of this case, we are of the opinion that the testimony concerning the alcohol test made of Farrar's blood, was part of the evidence that both the Manager of Safety and Excise and the Denver Civil Service Commission could properly consider; that there was sufficient competent evidence to support their respective findings; and that they did not abuse their discretion in so finding.

The judgment is accordingly reversed.

MR. JUSTICE HILLIARD dissents.

MR. JUSTICE HILLIARD dissenting.

The consequences to the veteran police officer involved, immediate and to continue, are so serious, that, the obvious weakness of the evidence against him considered — resolved in his favor by the trial court — I think the severe judgment to be imposed by our direction constitutes rare injustice. The court cites *State v. Cram* (Ore.), 160 P. (2d) 283, and *Hanlon v. Woodhouse,* 113 Colo. 504, 160 P. (2d) 998, in support of the doctrine that blood alcohol tests are competent evidence on the question of alleged drunkenness. That, I submit, this inquiry considered, is not the controlling question. What the trial court found, and the finding was based on undisputed evidence, was that for many years the officer had suffered from epileptic affliction of the

grand mal type, and his physical collapse while on duty well might be attributed to a sudden attack of that dread disease. The objection to the blood alcohol tests was, that, from the time the blood was taken from the officer until it was examined, integrity of identity of the sample did not attend. Of a verity, lack of care in that regard clearly appears, which, as I think, operated to make it incompetent.

Bearing in mind that the evident inherent weakness of the "alcoholic test" testimony, and noting the statement in the court opinion that "there was 'no liquor' on Farrar's breath, either at the time he was picked up * * * or at the time the blood was alleged to have been taken from him at the Denver General Hospital," I think the trial court was warranted in resolving the doubt in favor of the officer. Indeed, as my study convinces, proof of intoxication, which was the charge, failed altogether. By our determination, running counter to the judgment below, a police officer, no longer young, of extended satisfactory service, not only is to suffer present separation from a livelihood earned in prosaic police duty, but retirement benefits that would make for his physical comfort through the years of nonearning ability, almost at hand, will be lost to him.

While I, no less than the trial judge will be, as he proceeds on our mandate, am unable to prevent what I conceive to be an undeserved visitation upon an humble and unsung public servant, still, as properly I may, I voice my approval of the sound and humane judgment of the learned trial jurist.