No. 17,379.

BROWN *v*. THE PEOPLE.
(273 P. [2d] 128)

Decided August 3, 1954.

Mr. IRVING P. ANDREWS, MARILYN T. MEADOFF, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the People.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

PLAINTIFF in error, to whom we will hereinafter refer as defendant, was charged with having committed the crime of first degree murder by information filed in the district court of the City and County of Denver. He entered separate pleas of not guilty, and not guilty by reason of insanity at the time of the alleged commission of the crime. He first was tried on the issue of guilt or innocence pursuant to procedures directed by chapter 144, Session Laws of Colorado 1951. The verdict of the jury upon the trial was guilty of murder of the first degree and the penalty was fixed at death. Thereafter another jury was summoned to determine the issues raised upon the plea of not guilty by reason of insanity. The verdict returned upon that issue was that defendant was sane. Thereafter defendant, by petition, raised the issue as to whether he had become insane after the verdict of guilty and before judgment was entered. On that issue a third jury found defendant had not become insane since the commission of the crime and was presently sane.

Upon the first trial it appeared from the evidence that defendant and the deceased, Jerry Houston, with whom he had been keeping company for about nine months, spent the late afternoon and night of September 6, 1952, drinking and taking various friends and soldiers about the city and to Lowry Field; that they awakened on the morning of September 7, 1952, in the apartment of a

friend and had breakfast at a restaurant; and that they separated for a brief time during which defendant drove to his sister's home and got a pistol for the purpose, as he said, of doing some target shooting. After procuring the pistol he again picked up deceased and they drove to a drugstore where they had a soft drink and returned to the car. Deceased got in the front seat and defendant took his place behind the wheel. When they entered the car the pistol was on the front seat. Defendant admitted picking up the pistol and stated that he started to put it in the glove compartment when deceased, apparently believing she was in danger, grabbed for it. Defendant stated that "it went off," but after it discharged once he couldn't remember anything. Deceased was shot five times, as the result of which she died.

With the body in the car defendant drove to his home where, as witness Sessions testified, defendant said, "I just shot Jerry. I just shot Jerry." * * * "I shot her four or five times and I think she's dead." * * * "Call the police, please." Defendant had the gun in his hand and went upstairs to his room where he removed the empty cartridge shells from the pistol and reloaded it. He then left his room and went to the house where he and deceased had spent the night, and witness Bertha Mae Lincoln testified he said, "Call Jerry's mother. I have just shot Jerry five times." Upon being asked if she was dead he replied, "If she wasn't, I'd put five more bullets in her * * *." According to the landlady, Mrs. Rice, defendant made a statement to her in which he admitted, in substance, that he had shot deceased five times, and he requested her to go with him to the car to see if Jerry was dead, again stating, if she wasn't he "would finish her."

Defendant was placed under arrest and made a written statement in the presence of investigating officers, which we quote in part as follows: "The pistol was lying in the seat. I picked it up and went to put it in the glove compartment and she thought I was going to do some-

thing to her. Reaches at my hand and I jumped back and when I jumped back, the pistol went off and hit her and she fell over and after that, I don't remember anything. I know after the first one, I heard nothing else. * * *"

The shooting took place September 7, 1952. Police officer Gale, called as a witness, was asked whether he had seen the deceased, Jerry Houston, on September 4, 1952. He answered that he had seen her at 5:00 o'clock in the morning at 2908 Williams street. On direct examination he also was asked, "Will you describe her appearance at that time, Officer?" Counsel for defendant objected to the testimony, and, out of the hearing of the jury, considerable discussion took place between counsel and the court in which the latter inquired of the District Attorney whether the purpose of the question was to show generally the relationship between defendant and deceased, and the prosecutor replied: "Even more than that, your Honor, even more than the relationship. It is more to show what transpired, and this leads right up to the exact killing. It is all a complete part of the transaction because we contend the reason she was killed, because she was going down to sign a complaint."

Thereupon the court permitted the question to stand, and over continuing objections the officer testified, inter alia, as follows:

"She was crying and groaning. Her physical appearance, she was bruised about the face, heavily bruised under the eyes. Her one cheek was badly bruised. She had a bad bruise above—on her chest above her right breast.

* * *

"She had a laceration on her left knee. Her blouse had grass stains and dirt stains on it. Three of the four buttons on her blouse were gone. There was a torn place under her left armpit of this blouse. In her hair there was grass, blades of grass in her hair, as well as dirt from the ground and blood stains."

The officer further testified that she made a complaint

to him, and thereupon the following testimony was admitted: "Q. Now, without going into any conversation, against whom did she make the complaint?

"Mr. Andrews: Just a moment. Your Honor, we object to that. We object to that. That is highly improper at this time, and counsel knows it.

"The Court: Objection overruled.

"Mr. Andrews: We object to it further on the grounds of its being hearsay. That goes into the course of the conversation. [This objection was overruled.]

\* \* \*

"Q. (By Mr. Flanigan) Did you understand my question, Officer? A. Yes, Sir. Q. Against whom did she make the complaint? A. She made the complaint against Marion H. Brown, Jr."

The only other testimony in the record relating to any incident on September 4, 1952, was that of a taxi driver who stated that, between 2:00 and 3:00 o'clock in the morning on that date he drove deceased and defendant to an address on East 22nd avenue; that as he got out to collect his fare he heard cursing and loud talking and, "then all of a sudden I see both of them hit the ground, and as they both hit the ground I see they are down there on the ground scuffling." He further testified, in substance, that he touched Brown on the back and told him that he shouldn't do that, and that Brown got up and the girl got back in the car and thereupon defendant told her that he didn't ever want her back in his house again. On cross-examination the taxi driver stated that at no time did he see defendant strike the girl; that he didn't know whether they had fallen to the ground, or how they got there; that there had been no fight in the cab; and that he had seen them together thereafter, apparently on good terms.

One of the questions, hereinafter considered, arises out of the cross-examination of defendant. On direct examination he stated that while deceased waited for him he went and got the gun for the purpose of going target

shooting with her, and that he and deceased had gone target shooting on other occasions. On cross-examination the following testimony, inter alia, was introduced:

"Q. And the reason you got this pistol was because you wanted to teach Jerry some more shooting, is that correct? A. I had been teaching her how to shoot the pistol. That's the reason I got the pistol. Q. And each time that you obtained this pistol or this revolver, you always got it for the purpose of practicing shooting, is that right, sir? A. I have obtained that pistol more than that purpose. I used that pistol on a trip we made to Oklahoma at one time. Q. Any other purpose? A. No more than for target practice. Q. Target practice on what? A. Just empty cans, empty bottles."

Defendant then testified that he had taken the gun on most trips he had made out of town. The District Attorney then asked: "Mr. Brown, did you have occasion to sign for that revolver on July the 17th of 1950?" Objection was made to the relevancy of the question, but was overruled. Defendant answered that he did not remember the date, but the gun was released to him by officer Sam Finney at police headquarters. Upon being asked how it happened to be released, objection was made that it was immaterial how he got the gun in 1950. The inquiry related to an incident which occurred more than two years before the date of the offense for which defendant was on trial. No one contended that it involved defendant and the deceased in any way. The objection was overruled, and defendant answered the question by stating, in substance, that in March, 1950, he borrowed the pistol to make a trip to New Mexico to get married; that he didn't return it and it was involved in a case in 1950, and the police confiscated it. The following testimony then was introduced: "Q. You say the gun was involved in a case? A. That's right. Q. Were you involved in it? A. Yes, I was. It was a matter of self-defense. * * * Q. Did that particular transaction involve a person by the name of Joel James?" Counsel for de-

fendant renewed his objection, which was sustained, the court stating that the details should not be gone into. There the matter was permitted to rest.

Questions to be Determined.

■ First: *Did the trial court err in receiving in evidence the testimony of officer Gale, hereinbefore quoted?*

This question is answered in the affirmative. The objection of counsel for defendant was good and should have been sustained. Unless the District Attorney was in a position, by competent evidence, to definitely connect the physical condition of deceased — as testified by the officer — with some act of violence on the part of defendant, it should not have been brought into the case. The District Attorney failed to produce any competent evidence identifying defendant as having been responsible for the bruises on the person of deceased observed by the officer at 5:00 o'clock on a morning three days prior to the date of the crime charged. It is elementary that any conversation then had between the deceased and the police officer could not properly be used in evidence against defendant. More than two hours had elapsed after defendant and deceased had parted company. Any testimony from the police officer detailing what was told to him by deceased would be hearsay evidence. The character of the evidence is not changed from forbidden hearsay to competent evidence by the technique of permitting the officer to draw his conclusions from all that was said by deceased, and give the result thus obtained in one sentence to the effect that, "She made the complaint against Marion H. Brown, Jr."

■ The prejudicial character of this incompetent evidence is manifest when we consider that it is the only testimony which in the least purports to identify defendant as being responsible for the bruises suffered by deceased, and the further fact that the District Attorney admittedly used this incident as the motive for the killing which took place three days later. We repeat his statement to the court in this connection. He said: "It is

all a complete part of the transaction because *we contend the reason she was killed, because she was going down to sign a complaint.*" (Emphasis supplied) It is proper, in cases of this kind, to prove the motive which may have been involved in the crime, but it can not be established by hearsay evidence. It is contended that the testimony was admissible as a part of the res gestae. Suffice it to say that such contention is without merit. None of the essential elements, permitting the admission of testimony as an exception to the hearsay rule upon the ground of res gestae, are present in this case.

■ Second: *Was error committed in permitting the District Attorney, on cross-examination, to question defendant as to the circumstances under which the murder weapon was released to him more than two years prior to the killing involved in the instant case?*

This question is answered in the affirmative. There was no question as to whether the gun, which was an exhibit, was the one used by defendant in the killing. He admitted that he had the gun in his hand at the time deceased was killed. He stated that he had gone target shooting with her on former occasions and that he had shot at cans and bottles with it.

The District Attorney then attempted to show that in the year 1950 defendant must have been using the gun for some other purpose than shooting cans and bottles because at that time the gun was released to him by the police department. The record discloses that the prosecutor contended this was proper cross-examination. as going to the credibility of the witness, the argument being that if a man states, with reference to an incident which occurred in 1952, that he had gone target shooting with the pistol and had taken it with him on trips, his credibility can be impeached by showing that, more than two years prior to the act for which he was on trial, the gun had been taken from him by police and thereafter returned to him. Testimony as to the use defendant may have made of the pistol in the year 1950 in some incident

which was wholly unrelated to the instant case was wholly immaterial and inadmissible for any purpose. Our Court is fully satisfied that the real purpose of the cross-examination in this particular was to present to the jury by indirection that which could not have been presented directly, namely, the fact that defendant had been involved in a police "case" in 1950; that the same gun was involved in that "case"; and that the victim involved in that case was a man by the name of Joel James.

Under the pretext of impeaching the credibility of the witness on a subject wholly immaterial to any issue in the case, the District Attorney succeeded in getting before the jury matters which never should have been presented for their consideration. The only competent evidence relating to the 1950 "case," which was admissible as bearing upon the credibility of the defendant as a witness, would relate to the fact of conviction of a felony based thereon, if any such conviction had occurred. No such question was asked of defendant and it must be assumed that no conviction of defendant of a crime followed the "case" in 1950.

Our Court cannot say that the members of the jury were not influenced to the prejudice of defendant by the erroneous admission of the testimony to which reference is hereinbefore made. It was the duty of the jury to determine whether the penalty for defendant's crime should be fixed at death or life imprisonment. We cannot uphold the exercise of this discretion in favor of the extreme penalty where there is the probability that incompetent evidence influenced the jury to fix the death penalty.

The judgment is reversed and the cause remanded for retrial.