No. 17,442.

BANEY v. THE PEOPLE.
(275 P. [2d] 195)

Decided October 25, 1954.

Mr. ROBERT B. LEE, Mr. M. O. SHIVERS, JR., for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the People.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, herein referred to as defendant, was charged in an information filed October 15, 1953 by the district attorney in and for Arapahoe county, Colorado, with murder and assault to rape. On December 17, 1953 an additional count was added to the information charging defendant with forcible rape. The victim named was one Dorothy H. Gall. To each of these counts defendant entered pleas of not guilty. Trial was commenced on January 19, 1954 and at the close of the People's case defendant moved for a directed verdict of not guilty as to all counts in the information. This motion was denied. After defense and rebuttal witnesses testified, defendant's counsel again moved for a directed verdict of not guilty as to each count. The motion so made was sustained as to the count charging murder, and denied as to the other two counts. The remaining issues were submitted for determination by the jury

which, by its verdicts, found the defendant not guilty of assault to rape and guilty of forcible rape. Defendant was sentenced to the state penitentiary and he brings the cause here by writ of error seeking reversal of the judgment of conviction.

The principal error urged for reversal is the admission in evidence, over the strenuous objection of defendant's counsel, of the recitals of Dorothy H. Gall made to deputy sheriff Wakefield and Dr. Patton some ten or fourteen hours after she returned to her home following the alleged attack. It is contended that these declarations were hearsay and hence not admissible. It is frankly, and we say commendably, admitted by the Attorney General "* * * no other witnesses other than Deputy Sheriff Wakefield and Dr. Patton touched on matters relating to venue. Certainly, if the statements of deceased were admissible, the jury was justified in finding the crime was perpetrated in Arapahoe County. If this Court should decide the statements of deceased were not admissible, we find no evidence to support proof of venue." The Attorney General in his brief says: "It is conceded that proof of venue is essential and that the burden of establishing it is upon the prosecution." *Dustin v. People,* 116 Colo. 433, 181 P. (2d) 457.

According to the evidence, defendant was in Denver on his way from his home in Salem, Oregon to New Orleans, La. He arrived here on the evening of September 18, 1953, coming in his automobile, described in the evidence as a 1938 Cadillac, painted black. According to the testimony of two witnesses employed at the Mir-O-Bar Tavern, defendant was seen at that place in the company of Dorothy H. Gall at about 1 A.M. on the morning of September 20, 1953. A taxicab driver testified that he picked up defendant and a woman at this Tavern about 1:10 A.M. on the same day and drove them to a parking lot next to a hotel on Cleveland Place in Denver. The taxi driver could not identify the woman. The two passengers in the taxicab left the car at the

parking lot and entered a dark limousine type of car, which the taxi driver identified as looking like a 1937 or 1938 Packard automobile.

At about 1:55 P.M. September 20, 1953 in response to a call (not from Dorothy H. Gall) deputy sheriff Wakefield interviewed Dorothy H. Gall at her home in Denver, and she related to him a story of an attack and rape. Wakefield then took her around the countryside in Arapahoe county in his automobile, traveling some thirty or thirty-five miles in an effort to locate the scene of the attack. Wakefield asked Miss Gall at a certain point in their journey: "Does this look familiar?" She replied: "Yes, officer, it looks familiar." At another place in his testimony Wakefield said Miss Gall told him in answer to his inquiry: "This looks like the place." Later, he took her to the office of Dr. Lee F. Patton, an Englewood, Colorado physician. At five o'clock in the afternoon of September 20, 1953 Dr. Patton interviewed Dorothy H. Gall and made detailed notes of the story of the attack, related by her. Dr. Patton examined Miss Gall and discovered a laceration of her vagina (of which she had not complained) and recommended that she go to the Colorado General Hospital to have this laceration cared for. She refused, and Dr. Patton then recommended that she go to the Porter Hospital. She reluctantly consented to go there. Dr. Patton took her to that hospital and instructed an interne there to administer a pudental block with novocaine and repair the laceration. Complying with these directions, novocaine was injected into the perineum of the patient. Shortly after the injections began, convulsions of the grand mal type followed and the patient ceased to breathe. Emergency calls were placed for additional physicians, all of whom took part in an attempt to save the life of the patient. She died about 7:45 P.M. on September 20, 1953. The testimony of all the expert witnesses was that none of the wounds or injuries appearing on the person of Dorothy H. Gall were mortal wounds or injuries, and that none, or all of

them combined would cause death. An autopsy was performed on the body of Dorothy H. Gall and a sample of her blood taken. That she died of an anaphlylactic, or allergic, reaction to the novocaine was not disputed.

She told the deputy sheriff that she lost a shoe and her billfold during the attack upon her. Neither of these articles were found, although the deputy sheriff made search for them at the place Miss Gall said "looks familiar."

The recital of Miss Gall concerning her experiences on the early morning of September 20, 1953, as detailed by Wakefield and Dr. Patton, were to the effect that she went into a bar on 15th street in Denver; there she met a man; had some drinks, after which they went to the Mir-O-Bar where they had more liquor; they left in a taxi and went to a parking lot where they got into this man's car and drove to her home in south Denver. While parked in front of her residence she said the man suddenly grabbed and choked her and hit her on her neck and shoulder. She became unconscious and awoke in the car quite a distance in the country; that this man disrobed her after she got out of the car; laid her on the ground and attacked her. He then returned her to her home, where he again parked the car. They talked for a while; she got out of the car and as it left she was able to see the numbers on the license plate of the car, but not the name of the state which issued the plate. She said she went into the house and wrote the first three numbers of the plate on a piece of paper. This paper she delivered to Wakefield and it was introduced in connection with his testimony. She said she took a peroxide douche and gargle and went to bed. This was about 3:30 A.M. She arose at about 7 o'clock A.M. the same day, later phoned to a Denver lawyer, who in turn called a Denver police officer. Neither of these persons testified. Deputy Sheriff Wakefield called on her at her home at about 1:55 P.M. on September 20, 1953 and investigated the case. He said that Miss Gall described her assailant;

said his "hair had slipped" and that she was in a "joking mood" when she made the remark. Wakefield saw black and blue marks on her neck and shoulder. Dr. Patton testified that Miss Gall answered his questions "very freely"; said "she seemed to be very clear, but her answers had to be prompted; that she was nervous and "rather excited." The narration given by Dr. Patton was more detailed and embraced some matters not included in the statement repeated by Wakefield.

It is evident from the record that the narration of the events given by Wakefield and Dr. Patton was concerning alleged facts given these witnesses by Miss Gall in many instances as a result of questions propounded by the witnesses.

In *Graves v. People,* 18 Colo. 170, 32 Pac. 63, we quoted from Wharton's Criminal Evidence (9th ed.) section 262, as follows: "Res gestae are events speaking for themselves, through the instinctive words and acts of participants, not the words and acts of participants when narrating the events. What is done or said by participants, under the immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks. In such cases it is not necessary to examine as witnesses the persons who, as participators in the transaction, thus instinctively spoke or acted."

With respect to statements of victims of various sexual offenses made about a day after the commission thereof the courts, without setting forth the circumstances surrounding the making of such statements, have rather summarily regarded such statements as not falling within the res gestae rule. *Brown v. State,* 127 Wis. 193, 106 N.W. 536; *State v. Aldrick,* 97 Wash. 593, 166 Pac. 1130; *State v. Arnold,* 144 Wash. 367, 258 Pac. 20; *State v. Schultz,* 41 S.D. 184, 169 N.W. 547; *State v. Rothi,* 152 Minn. 73, 188 N.W. 50.

We quote the syllabus by the court in *State of Minnesota v. Quinnild,* 231 Minn. 99, 42 N.W. 2d 409: "State-

ments made to other members of a crew by a 13-year-old boy temporarily employed as a laborer with his father's construction crew as to criminal acts claimed to have been committed on the boy by defendant were not admissible as a part of the res gestae where it appeared from the record that the statements were not spontaneous utterances made at the first opportunity and generated by an excited feeling which extended without a break or letdown from the time the alleged crime was committed to the time the statements were made, but, rather, that they were made an hour and a half or two hours after he had returned to the bunkhouse following the commission of the alleged act and after the boy had taken a shower bath, had thought the matter over, and had 'dozed off' to sleep for a while."

In the Quinnild case, supra, the boy testified the alleged assault and his statement made to the other members of the crew some hour and a half after he returned to the bunkhouse was considered hearsay and the case was reversed for error in the admission of this testimony. The court observed: "While we have no way of knowing whether the boy's testimony as to the crime complained of, standing alone, might have brought about the verdict reached by the jury, it is our opinion that the testimony objected to was not admissible as part of the res gestae and that a new trial should be granted."

In *Clark v. People,* 103 Colo. 371, 86 P. (2d) 257, we said: "If it be argued that statements made to Dr. Currigan are admissible under a supposed rule permitting a patient to give a history of his or her case, we must remember that such statements are admissible only in so far as they relate to the patient's symptoms and conditions, but that statements concerning the question of responsibility for an injury or physical condition are inadmissible. *Lowery v. Jones,* 219 Ala. 201, 202, 121 So. 704, 706, * * * The responsibility cannot be fixed in this roundabout way as a substitute for legal evidence that is not available." The same rule is announced in *Cobianchi*

*v. People,* 111 Colo. 298, 141 P. (2d) 688, and in *Pomeroy v. People,* 116 Colo. 518, 182 P. (2d) 139.

In *Donaldson v. People,* 33 Colo. 333, 80 Pac. 906, this Court, quoting from Greenleaf on Evidence (16 ed.) §213, said: "The complaint constitutes no part of the *'res gestae';* it is only a fact corroborative of the testimony of the complainant; and, where she is not a witness in the case, it is wholly inadmissible."

The case of *Herren v. People,* 28 Colo. 23, 62 Pac. 833 is in many respects analagous to the fact situation in the instant case. There, the husband was charged with the murder of his wife. The son testified to a wordy quarrel between the parties at about eight o'clock of the same day the wife appeared at a power house near her home and a man there inquired what the matter was, the wife said: "He knocked me down and I thought he knocked me cold." Later in the day she had ample opportunity to make complaint, but did not do so. She died suddenly the next day. In reversing the conviction, the Court said: "The testimony of the witnesses Wilson and Pike was admitted by the trial court upon the theory that it was a part of the *res gestae.* The ruling was palpably wrong. The mere statement of the case, as above made, shows it. The purported declarations were neither spontaneous nor voluntary. There were in response to questions asked, and were clearly narrative of a past event, in no sense explanatory of the principal fact, or connected with it."

In Am. Jur., 1954, Cum. Supp. to vol. 20 (Evidence) section 670.5 (New Text) we find this significant language: "When the interval of time between the utterance and commission of the offense extends over a period of several hours or more, there is little likelihood of such statement being regarded as part of the res gestae."

The case of *Graves v. People, supra,* is cited in *Stahl v. Cooper,* 117 Colo. 468, 190 P. (2d) 891: We quote: "Res gestae are events speaking for themselves, through

the instinctive words and acts of participants, not the words and acts of participants when narrating the events. What is done or said by participants, under the immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks.' *Graves v. People,* 18 Colo. 170, 32 Pac. 63. Such a statement, if part of the res gestae, must be in the nature of an exclamation, rather than an explanation; it must be spontaneous and instinctive rather than deliberate."

■ Whether a declaration is a part of the res gestae "depends upon whether the declaration was the facts talking through the party or the party talking about the facts." 20 Am. Jur. Evidence, section 662.

■ In the present case the jury was allowed to consider evidence of a character that has been universally condemned as improper; evidence violative of fundamental and long established principles governing the trial of criminal as well as civil cases. We must conclude that the statements detailed by the witnesses as coming from the victim of the alleged assault were a mere narration of the events, hence hearsay, and not admissible. See *Brown v. People,* 130 Colo. 77, 273 P. (2d) 128, decided August 3, 1954.

The defendant was apprehended in Kansas City, Missouri, and voluntarily returned to Colorado with the deputy sheriff, together with his car, which he had owned since September 1, 1953. From this car the authorities removed a portion of the floor mat and a piece of the upholstery from the top of the front seat. Also taken from defendant's car were hairs found therein. By order of court the body of Miss Gall was exhumed and hairs from her head were obtained. The blood sample; floor mat; portion of the seat, together with the hairs found in the car and those taken from the head of Miss Gall were all sent to the F.B.I. in Washington, D.C. An expert from that department testified he found human blood on the mat and seat cover which was of Type "O," and that the

blood taken from the body of Miss Gall also was of Type "O." There is absolutely nothing in this record to indicate that the Type "O" blood found in the car came from the body of Miss Gall. No witness testified that she had more than contusions and "black and blue" marks. None of Miss Gall's clothing worn on this occasion was introduced in evidence.

Concerning the hairs found in the car, the F.B.I. witness testified they were similar to those taken from the head of Miss Gall, but that positive identification was impossible because there were not enough identifiable characteristics to make a positive comparison. Defendant did not testify at the trial, but was quoted by investigating officers as having at all times denied any connection with the alleged crimes.

Realizing that the People's case was purely circumstantial and that no direct evidence was available, the court instructed the jury on circumstantial evidence. Without "an assist" from some source, the case of the People must necessarily have failed because the facts and circumstances were not such as were incompatible with the innocence of the defendant and incapable of explanation upon any reasonable hypothesis other than that of the guilt of defendant. *Beeler v. People*, 58· Colo. 451, 146 Pac. 762.

█ The District Attorney sought to supply the "assist" we have mentioned by introducing the hearsay evidence to which we have referred. Eliminating the hearsay testimony given by witnesses Wakefield and Patton, and relying solely on the circumstantial evidence in this record, it cannot be said there is evidence on which a verdict of guilty could properly be based, bearing in mind the degree of proof required in cases based solely on circumstantial evidence. We therefore conclude that with the elimination of the hearsay testimony of the witnesses Wakefield and Dr. Patton, the case of the People failed.

The judgment of the trial court is reversed and the

cause remanded with directions to discharge the defendant.