The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Kenneth H. BOTHAM, Jr., Defendant-Appellant.

No. 27525.

Supreme Court of Colorado, En Banc.

June 8, 1981.

Rehearing Denied June 29, 1981.

J. D. MacFarlane, Atty. Gen., John R. Rodman, Lynne Ford, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Carol L. Gerstl, Sp. Deputy State Public Defender, Norman Mueller, Deputy State Public Defender, Denver, for defendant-appellant.

ERICKSON, Justice.

The defendant-appellant, Kenneth Botham, Jr., was charged with the first-degree murders of his wife, Patricia Botham, his neighbor, Linda Miracle, and her two sons, Chad and Troy Miracle. A jury found the defendant guilty of first-degree murder of Patricia Botham, and also returned verdicts finding the defendant guilty of three counts of second-degree murder for the deaths of Linda, Chad, and Troy Miracle.[1] The trial court sentenced the defendant to three consecutive terms of 20–30 years on the second-degree murder convictions, and to death for the first-degree murder conviction.[2]

On appeal, the defendant asserts that the trial judge erred by: (1) denying his motion for substitution of judge and refusing to recuse himself; and (2) not granting his motion for a change of venue. The defendant also claims that the cumulative effect of the errors asserted, coupled with erroneous evidentiary rulings, denied him a fair trial.

The defendant has raised serious constitutional questions which center on whether he was denied a fair trial. We conclude that the combined and cumulative effect of the errors asserted denied the defendant his constitutional right to a fair trial. We reverse the defendant's convictions and remand for a new trial before a different judge.

### The Factual Background

The Bothams and Miracles lived across the street from each other in Grand Junction, Colorado. On the night of August 22, 1975, Patricia Botham, Linda Miracle, and her two sons, Chad and Troy, unaccountably left their homes. Several neighbors testified that they heard shouts and noises sounding like gun shots coming from the

1. Sections 18–3–102 and 18–3–103, C.R.S.1973 (1978 Repl. Vol. 8).

2. The Colorado death penalty statute under which the defendant was sentenced, section 16–11–103, C.R.S.1973 (1978 Repl. Vol. 8), was declared unconstitutional in *People v. District*

*Court*, 196 Colo. 401, 586 P.2d 31 (1978). The issues raised on appeal regarding the constitutionality of the death penalty statute and its application to the defendant in this case are moot.

Botham and Miracle homes in the early morning hours of August 23. One neighbor testified that after hearing the shots, she looked through the window and saw someone resembling the defendant carrying a bundle from the Miracle residence. The same neighbor also remembered seeing a car similar to the defendant's parked in the Miracle driveway. Another neighbor testified that she saw a man physically resembling the defendant outside the Miracle residence around 1:00 or 1:30 a. m. on August 23. None of these witnesses, however, positively placed the defendant in Grand Junction during the early morning hours of August 23.

The defendant testified that he left Grand Junction early in the evening of August 22, for a weekend trip to the mountains in order to do some photography. Instead of camping out as planned, the defendant spent the night in Ouray at Polly's Motel and Campground. Several witnesses testified that they saw the defendant in Ouray on the evening of August 22. None of the witnesses, however, testified that they could place the defendant in Ouray after 11:00 p. m. on August 22. The defendant testified that he spent the night in Ouray and left the following afternoon. He told the jury that he returned to Grand Junction around 4:00 p. m. on August 23. He said that his two sons were home when he arrived, but that he could not find his wife. After checking with several neighbors, he called the police and reported his wife missing. During their search for Patricia Botham, the police went to the Miracle residence and discovered that Linda Miracle and her two sons were also missing. There were no signs of violence or forced entry at either the Botham or Miracle homes, and the police speculated that the four had simply left their homes together.

On September 28, 1975, the body of Linda Miracle was discovered near Bridgeport in the Gunnison River. Patricia Botham's body was discovered in the Gunnison River on October 2, 1975. The following day, the bodies of Chad and Troy Miracle were also found in the river. Each of the bodies was bound with wire to a piece of railroad iron.

The coroner determined that Patricia Botham and Linda Miracle died of asphyxiation. Chad and Troy Miracle each died from a .22 cal. gunshot wound to the head.

During the investigation of the homicides, the Grand Junction Police Department and the Mesa County Sheriff's Office uncovered certain physical evidence which they believed linked the defendant to the homicides, including wirecutters and the presence of blood stains in the defendant's automobile. Circumstantial evidence also linked the defendant to the homicides.

The defendant was arrested November 8, 1975. Following a preliminary hearing, an information charging the defendant with four counts of first-degree murder was filed in the district court of Mesa County. Prior to trial, the defendant moved for a change of venue from Mesa County to an area outside the general area served by the Mesa County media. Crim.P. 21. Sections 16–6–101 and 16–6–102, C.R.S.1973 (1978 Repl. Vol. 8). The motion for change of venue was predicated on the theory that extensive and highly prejudicial pretrial publicity in Mesa County prevented the defendant from obtaining a fair trial. The defendant also filed a motion to select a jury from veniremen outside of Mesa County. Both motions were denied. The defendant subsequently discovered information which he asserted showed that the trial judge was prejudiced against him, and he, therefore, moved for substitution of judge pursuant to Crim.P. 21(b) and section 16–6–201, C.R.S.1973 (1978 Repl. Vol. 8). The court denied the motion on the grounds it was untimely and legally insufficient.

The defendant's trial began on November 15, 1976. Jury selection lasted two weeks. Following a two-week trial, the jury commenced deliberation on December 11, at approximately 4:30 p. m., and returned a verdict the following day at approximately 4:30 p. m.

I.

*Substitution of Judge*

The defendant asserts that the trial court erred in denying his motion for substitution

of judge. We conclude that the defendant's motion and affidavits established the appearance of prejudice against the defendant and the motion should have been granted.

Several weeks after this case had been assigned to Judge Ela, the defendant's attorneys, who were state public defenders, informed the trial judge that they had just discovered information which tended to show that the judge was prejudiced against the defendant. The second paragraph of defendant's verified motion for substitution of judge stated:

"2. As evidenced by the attached affidavits, defendant believes that this Court, even prior to the time defendant was arrested and charged in the instant case, has made statements which indicate the Court's belief in the guilt of the defendant. The fact of such statements having been made suggests the Court has prejudged the instant case and issues raised thereby."

Two affidavits were filed in support of the motion. One affiant, Rollie Rogers, who was then the Colorado State Public Defender, stated that he was a party to a conversation with Judge Ela when the judge said that there were four unsolved homicides in Mesa County and that there was a suspect but that no one was in custody. The affidavit set forth that Judge Ela said: "I know what I would do, I would put the guy in jail, choke a confession out of him and charge him with the first degree murders." Judge Richard D. Greene, who was the second affiant, corroborated the first affiant's statements.

Judge Ela denied the motion. He ruled that the motion was untimely because more than ten days had elapsed between the time when the case was assigned to him and the time when the motion was filed. The judge concluded: "Admittedly, though local counsel of the Public Defender's office, and Mr. Foreman from the State Public Defender's office did not know of the alleged grounds for disqualification, they are bound by the knowledge of Rollie Rogers, Esq., who is a member and director of their office. Under the rule, the motion was not timely filed."

Moreover, the trial judge concluded that the affidavits did not state sufficient grounds for disqualification. The court concluded that the motion and the supporting affidavits were legally insufficient because: (1) the affidavits did not in themselves allege any belief on the part of the affiants that the judge was prejudiced; (2) the judge's remarks could not have been directed towards the defendant individually because the defendant was not in custody at the time the remarks were made; (3) the agency relationship between the defendant and Rollie Rogers, the Colorado State Public Defender, disqualified Rogers from being a proper person to file an affidavit in support of the motion; and (4) the motion was conclusory in nature.

Crim.P. 21(b) provides:

"(1) Within ten days after a case has been assigned to a court, a motion, verified and supported by affidavits of at least two credible persons not related to the defendant, may be filed with the court and served on the opposing party to have a substitution of the judge. Said motion may be filed after the ten-day period only if good cause is shown to the court why it was not filed within the original ten-day period. The motion shall be based on the following grounds:"

\* \* \* \* \* \*

"(IV) The judge is in any way interested or prejudiced with respect to the case, the parties, or counsel. . . ."

Section 16–6–201, C.R.S.1973, states:

"(1) A judge of a court of record shall be disqualified to hear or try a case if:"

\* \* \* \* \* \*

"(d) He is in any way interested or prejudiced with respect to the case, the parties, or counsel."

\* \* \* \* \* \*

"(3) A motion for change of judge on any ground must be verified and supported by the affidavits of at least two credible persons not related to the defendant, stating facts showing the existence of grounds for disqualification. If

the verified motion and supporting affidavits state facts showing grounds for disqualification, the judge must enter an order disqualifying himself . . . ."

\* \* \* \* \* \*

"(5) The term 'related', when used in this section, means related within the third degree by blood, adoption, or marriage."

The purpose of the statute and rule for disqualification of a trial judge is to guarantee that no person is forced to stand trial before a judge with a "bent of mind." See, Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). When the judge who is accused of prejudice is called upon to determine whether a sufficient showing has been made to require disqualification, it becomes incumbent upon that judge to look solely to the sufficiency of the motion and accompanying affidavits in order to ascertain whether sufficient facts are set forth to require disqualification. As a matter of judicial policy, the court must accept as true the facts stated in the motion and affidavits for disqualification of a judge. Carr v. Barnes, 196 Colo. 70, 580 P.2d 803 (1978); People v. District Court, 192 Colo. 503, 560 P.2d 828 (1977); People v. District Court, 60 Colo. 1, 152 P. 149 (1915).

In reviewing the motion and affidavits, both the actuality and appearance of fairness must be considered. Even where the trial judge is convinced of his own impartiality, the integrity of the judicial system is impugned when it appears to the public that the judge is partial:

"The question never centers on the reasonableness or fairness of the image being created, but rather on the actual character of that image. If the actual character of the image created results in the appearance of bias or prejudice, a trial judge should recuse himself or herself, as such an appearance can be as damaging to public confidence in the administration of justice as would be the actual presence of bias or prejudice." ABA Standards for Criminal Justice, 6–1.7, commentary at 6.20 (2d ed. 1980).

The issues before us for review are: (1) the timeliness of the defendant's motion; and (2) the sufficiency of the motion and the accompanying affidavits.

When a motion for substitution of judge is made more than ten days after the case is assigned to the judge, the test governing the timeliness of the motion is whether the application is made as soon as possible after the occurrence or discovery of the facts which form the basis for the motion for substitution. In People v. District Court, 192 Colo. 503, 560 P.2d 828 (1977), this Court stated:

"When disqualifying facts do not occur or are not discovered by the moving party until after expiration of the time within which the motion and affidavits normally must be presented, application for a change of judge is timely if made as soon as possible after occurrence or discovery of those facts. Hendrickson v. Superior Court, 85 Ariz. 10, 330 P.2d 507 (1958); see, Dominic Leone Const. Co. v. District Court, 150 Colo. 47, 370 P.2d 759 (1962) . . . ." Id. at 507, 560 P.2d 828.

The trial judge in this case admitted that defense counsel did not know of the facts set forth in the affidavits within the ten day period specified in Crim.P. 21(b). Defense counsel informed the court as soon as possible after the discovery of the facts which formed the basis for the motion and filed a verified motion shortly thereafter. Accordingly, the motion was timely.

To be legally sufficient, the motion and affidavits must state facts from which it may reasonably be inferred that the judge has a bias or prejudice that will prevent him from dealing fairly with the defendant. Carr v. Barnes, supra; Walker v. People, 126 Colo. 135, 248 P.2d 287 (1952). The affidavits in support of the motion do not have to contain every essential fact which establishes the judge's prejudice. It is sufficient if the affidavits verify the facts set forth in the motion. People v. District Court, 60 Colo. 1, 152 P. 149 (1915).

As a factual basis for disqualification, the defendant's motion sets forth that prior to

the defendant's arrest, the trial judge made statements which reflect predisposition as to the defendant's guilt and prejudgment of the case. The affidavits refer to and verify the facts set forth in the motion.

■ The fact that the judge did not refer to the defendant by name in his statements to Rollie Rogers is immaterial. The record establishes that the defendant was the only suspect in the case at the time the statements were made, and prior to the defendant's arrest, there was extensive publicity about the crimes. Moreover there is nothing in section 16–6–201, C.R.S.1973, which forecloses a defendant's attorney from filing an affidavit in support of a motion for substitution of judge where the attorney-affiant is not related to the defendant within the third degree by blood, adoption, or marriage. Section 16–6–201(5), C.R.S.1973.

■ We conclude that the motion and affidavits were sufficient to require disqualification as a matter of law. Taken as true, the facts disclosed by the motion and affidavits establish that the trial judge had expressed an opinion that the defendant was guilty.

## II.

### Change of Venue

Prior to trial, the Botham case was the subject of extensive publicity in Mesa County. The investigation of the homicides, the defendant's arrest, and pretrial proceedings were described and portrayed to the community by the Mesa County newspapers and also on radio and television.[3] The voir dire in this case reveals the impact of the pretrial publicity on the jury and raises a presumption that the jurors selected to hear the case were not impartial. Accordingly, the defendant was denied his constitutional right to a fair trial and due process of law when the trial court denied his motion for change of venue.

■ The constitutional guarantee of a trial by a panel of impartial jurors must be considered in light of the concomitant right of the public and press to the full protections of the First Amendment. *U.S. Const.* Amends. I, VI, and XIV. *See also, Colo.Const.* Art. II, secs. 10 and 16. The path from *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) to *Richmond Newspapers v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), illustrates the difficult issues which a trial judge faces in striking the proper balance between competing constitutional rights. *Rights in Collision: Deciding Cases in the Free Press/Fair Trial Debate*, 49 U.Cin.L. Rev. 440 (1980); Stephenson, *Fair Trial— Free Press: Rights in Continuing Conflict*, 46 Brooklyn L.Rev. 39 (1979); *Fair Trial/Free Press: The Court's Dilemma*, 17 Washburn L.J. 125 (1977); Kaplan, *Free Press/Fair Trial: Rights in Conflict: Freedom of the Press and the Rights of the Individual*, 29 Okl.L.Rev. 361 (1976). *See also*, 34 Rocky Mtn.L.Rev. 37 (1961). Means do exist, however, to insure that the balance is never weighed against the accused. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The trial judge may: (1) cause extensive voir dire examination of prospective jurors; (2) change the trial venue to a place less exposed to intense publicity; (3) postpone the trial to allow public attention to subside; (4) empanel veniremen from an area that has not been exposed to intense pretrial publicity; (5) enlarge the size of the jury panel and increase the number of peremptory challenges; or (6) use emphatic and clear instructions on the sworn duty of each juror to decide the issues only on the evidence presented in open court. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). *ABA Standards for Criminal Justice*, 8–3.3 (2d ed. 1980). Regardless of the means imposed by the trial judge to insure the accused's constitutional right to a fair trial by a panel of impartial jurors, the critical inquiry is whether the chosen means did in fact preserve the accused's right to a fair trial. Here, the trial judge denied the defendant's

---

**3.** Our review of the pretrial publicity is necessarily limited to the newspaper articles in the record and the transcripts of some of the radio broadcast coverage which is part of the record.

motion for change of venue, relying instead on an extensive voir dire to insure the defendant's right to a trial by a panel of impartial jurors. Under the facts of this case, we conclude that the means adopted by the court were insufficient to protect the defendant's right to a fair trial.

 Where a defendant has not demonstrated the existence of massive, pervasive, and prejudicial publicity, which would create a presumption that he was denied a fair trial, *see, e. g., Sheppard v. Maxwell, supra; Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Walker v. People*, 169 Colo. 467, 458 P.2d 238 (1969), he must establish the denial of a fair trial based upon a nexus between extensive pretrial publicity and the jury panel. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Doud, supra; People v. McCrary*, 190 Colo. 538, 549 P.2d 1320 (1976); *Sergent v. People*, 177 Colo. 354, 497 P.2d 983 (1972); *Small v. People*, 173 Colo. 304, 479 P.2d 386 (1970). *ABA Standards for Criminal Justice*, 8–3.3 (2d ed. 1980).

In determining whether the publicity given these grisly homicides created an atmosphere which prevented the defendant from receiving a fair trial in Mesa County, we have reviewed the record to determine what occurred, how the information reached the public, the time relationship of the publicity to the actual trial, and the voir dire examination of the jury. We have concluded that this was not a case where there was such massive, pervasive, and prejudicial publicity that the denial of a fair trial can be presumed. However, we conclude that under the totality of the circumstances, after reviewing both the pretrial publicity and the voir dire examination of the jury, that the defendant was denied his constitutional right to a fair trial.

The defendant's trial was held in the Mesa County District Court in Grand Junction, Colorado. The *Daily Sentinel (Sentinel)* is Mesa County's only daily newspaper. Approximately 70% of Mesa County's residents subscribe to the *Sentinel*.[4]

From the time of the victim's disappearance and continuing through the defendant's trial, the Botham case attracted extensive publicity in Mesa County. Every step of the investigation and all subsequent court proceedings were reported in the *Sentinel*.

A large portion of the news stories were attributed to the police, sheriff's office personnel, or the district attorney. The source of the information tended to lend credence to the facts contained in the news stories. *See ABA Standards for Criminal Justice*, 3–1.3, 8–1.1, and 8–2.1 (2d ed. 1980). Other news sources included relatives of the victims and neighbors of the Botham and Miracle families who ultimately testified against the defendant at trial.

Certain facts in this case were reported with specificity. For example, a story in the September 27, 1975 edition of the *Sentinel* recounted the discovery of one of the bodies and said:

"The body was so badly decomposed that [the district attorney] and other law enforcement officials refused to speculate on how old the woman was, how long she had been in the river and whether the body was one of three young Grand Junction women who have disappeared in the last six months."

\* \* \* \* \* \*

"[T]he woman's facial features had been obliterated but . . . the figure of the body, only partially clothed, led [the men who discovered the body] to believe it was that of a young woman. . . ."

\* \* \* \* \* \*

"One of the men who discovered the body . . . said, 'It was in about 14 inches of water, I guess, in a little eddy in the willows. We wouldn't have seen it, except we went to see what smelled so bad.'

"Another [man] . . . said: 'We followed the smell to it. It ain't pretty.' "

On September 30, 1975, the *Sentinel* reported: "The body is so badly decomposed

---

4. Approximately 100 articles concerning the Botham case were reported in the *Sentinel*.

that authorities have been unable to identify it through facial features or fingerprints."

In another article, a sheriff's investigator was quoted as saying: "[T]he department will go back to the point where the body was found and attempt to locate missing teeth they believe fell from the jaw of the murder victim after death."

The series of articles on the discovery and identification of the bodies culminated with a lengthy interview with a forensic pathologist who described the procedures used to identify bodies and determine the time, cause, and manner of death.

The news media saturated Mesa County with the details surrounding the defendant's arrest. A November 9, 1975 *Sentinel* article quoted the district attorney as saying:

"After hundreds of interviews and examination of what [the district attorney] called 'a lot of physical evidence' gathered at various locations, authorities began to move toward the arrest of Botham in the middle of last week.

"[The district attorney] said that authorities, working 'day and night,' spent about two-and-a half days preparing an affidavit providing a 'factual basis' for issuing a warrant for Botham's arrest."

On November 11, 1975, the *Sentinel* published an article which detailed excerpts from the affidavit which supported the warrant for the defendant's arrest. The article stated that the facts in the affidavit established that: (1) the defendant told the police that he knew Linda Miracle's body was tied with wire, a fact which had not been released to the public at the time the defendant made this comment; (2) a pair of wirecutters which belonged to the defendant had been identified as those used to cut the wire which was tied around the bodies; (3) the defendant told the police that there was all sorts of wire in his shed, but there was none in his shed when it was searched by the police; (4) a friend of the defendant told the police that the defendant owned a .22 cal. revolver, but that the pistol was not among those turned over to the police

by Botham; and (5) a neighbor stated that at 1:00 a. m. on August 23, 1975, she saw a vehicle similar to the defendant's at the Miracle home and a man built like the defendant going into the Miracle home.

Another *Sentinel* article which appeared after the defendant's arrest was entitled "relief evident but fear lingers," and stated:

"Relief was the typical reaction following the arrest Saturday of Kenneth Botham in connection with four murders which kept the community on pins and needles for months...."

\* \* \* \* \* \*

"And even in talking with police following the disappearances of her neighbors, [a neighbor] was afraid.

"'Anybody that would be cruel enough to kill two children because they thought the children might talk wouldn't be beyond popping someone else off if they thought someone knew something....'"

\* \* \* \* \* \*

"[Another neighbor] summed up this feeling.

"'We're nearly satisfied they wouldn't have arrested someone if they didn't have enough evidence to support the arrest....'"

Following the defendant's preliminary hearing, headlines in the January 13 and 14, 1976 editions of the *Sentinel* read: "Authorities found .22 pistol under Botham house," and "Deputies failed to check under Botham house." The January 14 article stated:

"A crawl space underneath the former home of murder suspect Kenneth Botham went unnoticed by sheriff's investigators in three searches simply because they didn't know it was there.

"This was confirmed today by Mesa County Sheriff Dick Williams. He was responding to questions raised in the wake of testimony Tuesday in Botham's preliminary hearing in county court...."

\* \* \* \* \* \*

"The weapon is currently being tested by the Colorado Bureau of Investigation

to determine if it was involved in the deaths of [Chad and Troy Miracle]...."

"Autopsies performed on the boys revealed they died of gunshot wounds to the head from a .22 caliber weapon...."

The weapon was never identified as the murder weapon. Thus, prejudicial evidence was made known to prospective jurors that was not admitted at the time of trial.

Extensive newspaper and broadcast media coverage of the Botham case continued until the time of trial. Several of the defendant's pretrial motions generated front page coverage in the *Sentinel*.

 In the examination of the effect of pretrial publicity on the jury panel, a juror's assurance that he can lay aside his impression or opinion of partiality is not dispositive of a defendant's claim that he was denied his constitutional right to a fair trial. Where a defendant demonstrates the existence of a pattern of deep and bitter prejudice throughout the community where he is to be tried, a juror's assurance that he will be fair and impartial is not conclusive.

A factual summary of *Irvin v. Dowd, supra*, provides a foundation for analysis of the defendant's Sixth and Fourteenth Amendment claims. Irvin asserted that his conviction for murder was obtained in violation of his constitutional right to a fair trial by impartial jurors guaranteed by the due process clause of the Fourteenth Amendment. The United States Supreme Court reversed his conviction and remanded for a new trial.

Six murders, one of which formed the basis of Irvin's conviction, received extensive publicity in the small rural community where the defendant's trial was held. The defendant's first motion for a change of venue was granted. The trial, however, was moved to an adjoining county which had also been subjected to extensive publicity concerning the crimes. The defendant then sought a second change of venue to a county removed from the areas which had been subjected to pretrial publicity. The court denied the defendant's second motion on the basis of an Indiana statute which allowed only a single change of venue.

The voir dire examination in *Irvin* lasted four weeks. The jury panel consisted of 430 persons. The court excused 268 jurors on challenges for cause as having fixed opinions as to the guilt of the defendant. The defendant exercised all of his twenty peremptory challenges; the prosecution exercised ten peremptory challenges. Three hundred seventy prospective jurors, or almost 90% of those examined on the point of whether they had an opinion as to the defendant's guilt or innocence, entertained some opinion as to guilt. Two-thirds of the twelve jurors ultimately selected to hear the case had an opinion that the defendant was guilty and were also familiar with the material facts and circumstances of the case, including the fact that other murders were attributed to the defendant. The court said: "With such an opinion [of guilt] permeating [the jurors' minds] it would be difficult to say that each could exclude this preconception of guilt from his deliberations." *Id.* 366 U.S. at 727, 81 S.Ct. at 1645.

The Supreme Court reviewed the voir dire and concluded that the defendant was denied due process of law when the court denied his second motion for change of venue. The court concluded that the pattern of deep and bitter prejudice shown to be present throughout the community could not overcome each juror's assurance that he would be fair and impartial to the defendant.

In the case before us, the jury was composed exclusively of veniremen from Mesa County. One hundred six prospective jurors were examined by the court and counsel, in camera, over a two-week period. The defendant exercised all of his peremptory challenges. His motion for unlimited peremptory challenges was denied. The prosecution used fifteen of its seventeen peremptory challenges.

Eighty nine of the 106 jurors were explicitly questioned about pretrial publicity. Seventy seven subscribed to the *Sentinel*. Nine of the remaining twelve admitted that they were exposed to radio or television coverage of the case. Although not specifi-

cally asked, seven more jurors indicated that they had read or heard about the case through the media. Many jurors, when asked, remarked that this crime had been the most widely publicized occurrence in Mesa County in years.

The court or counsel asked seventy six jurors about their knowledge of the details of the crime. Fifty four possessed some detailed knowledge which they attributed to the newspaper, television, or radio.

Ninety jurors were questioned about their opinion of the defendant's guilt. Fifty seven admitted that they felt, at one time or another, that the defendant was guilty. Their reasons for believing in the defendant's guilt varied; some based their belief on what they had read in the newspaper; others admitted being influenced by the general attitude of their relatives, friends, and co-workers; a number stated that the defendant would not have been arrested and brought to trial if significant evidence against him did not exist.

Sixty jurors were excused for cause. Thirty two were removed from the jury panel because they could not set aside their belief that the defendant was guilty.

Ten of the fourteen jurors selected to hear the case received and read the *Sentinel.* Five of those jurors acknowledged that they also followed radio and television coverage of the case. Three of the remaining jurors admitted that they kept up with developments on the case through the radio or television media. The fourteenth juror, although not exposed to media coverage, knew some details of the crime.

All of the fourteen jurors remembered facts about the case. Each recalled that the bodies had been found in the Gunnison River. One thought that the murder weapon had been discovered under the defendant's house. Another heard that the murders were linked with drug transactions. A third recalled that a neighbor had seen the defendant carrying something from one of the victim's homes on the night that the four disappeared.

All of the fourteen jurors, in the course of the voir dire, stated that they would follow the court's instructions and decide the case on the evidence presented rather than on their preconceived opinions. A number of jurors stated that they realized that the rumors circulating through the community were not necessarily true. However, seven of the fourteen jurors admitted that they believed, at one time or another, that the defendant was guilty.

■ Based upon the number of jurors who entertained an opinion of the defendant's guilt; the number of jurors who had been exposed to pretrial publicity; the jurors' knowledge of the details of the crime; and the length of the voir dire, we conclude that the defendant has met his burden of showing the existence of an opinion in the minds of the jurors which raises a presumption of partiality. *Murphy v. Florida, supra; Irvin v. Dowd, supra.*

Here, more than 50% of the jury panel questioned on the subject, were inclined to believe in the defendant's guilt; one-half of the fourteen jurors selected to hear the case believed, at one time or another, that the defendant was guilty. More than 90% of the jury panel had been exposed to pretrial publicity; thirteen of the fourteen jurors selected to hear the case were exposed to pretrial publicity. Approximately one-half of the jury panel possessed detailed knowledge of the crime; all fourteen jurors selected to hear the case knew some details of the crime. Moreover, some of the evidence described by the news media was not admitted at the defendant's trial.

The pattern of prejudice throughout the community could not be overcome by the jurors' assurances of impartiality. In *Murphy v. Florida, supra,* the court declared:
> "In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others protestations may be drawn into question; for it is then more probable that they are part of the community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it."
*Id.,* 421 U.S. at 803, 95 S.Ct. at 2037.

Under these circumstances, we conclude that the defendant could not receive his constitutionally guaranteed right to a fair trial in Mesa County, and that the trial court erred when it denied his motion for change of venue.

### III.

### *Evidentiary Errors*

#### A.

The defendant asserts that the cumulative effect of numerous evidentiary errors denied him his right to a fair trial. We address two errors to avoid reoccurrence of the same errors in the new trial which we have ordered.

The prosecution offered the testimony of witnesses Doell and Montgomery as evidence of the defendant's hostility towards his wife, Patricia Botham.

Dr. Doell was the Botham's family physician from 1970 through the summer of 1975. Doell was allowed to testify that he observed bruises on Patricia Botham on six to eight occasions during the time that he served as the family physician. He also testified that he advised her to "get out of her situation" and obtain a divorce.

The defendant objected to Doell's testimony as hearsay. The trial court ruled that Doell could not testify that Patricia Botham had told him that her husband inflicted the bruises, but that it was appropriate for him to testify as to his own observations.

Officer Montgomery testified that in June or July of 1975, he went to the Botham residence and spoke with the defendant's wife. Without testifying as to anything Patricia Botham said, Montgomery testified that he subsequently removed a quantity of handguns from the house. He testified that the following week Patricia Botham contacted him and he returned the guns.

The defendant also objected to Montgomery's testimony as hearsay. In keeping with its ruling on Doell's testimony, the

trial court held that Montgomery could testify to his own observations.

 While motive is a proper inquiry in a homicide case, it cannot be established by inadmissible hearsay evidence.[5] Inadmissible hearsay evidence is not transformed into competent evidence by permitting a witness to testify as to his own observations when the effect is the same as admitting inadmissible hearsay on statements or conduct which are not in evidence. *Baney v. People*, 130 Colo. 318, 275 P.2d 195 (1954); *Brown v. People*, 130 Colo. 77, 273 P.2d 128 (1954). *Compare, Berger v. People*, 122 Colo. 367, 224 P.2d 228 (1950) (evidence of acts of violence by the defendant towards the deceased held admissible when testified to by eye and ear witnesses to the violence and threats); *Romero v. People*, 170 Colo. 234, 460 P.2d 784 (1969) (evidence of prior threats and ill feeling between the deceased and the defendant were properly admitted where the evidence was in the form of admissions by the defendant).

Moreover, Montgomery's testimony that he removed a number of handguns from the Botham residence is irrelevant to establish evidence of ill will on the part of the defendant towards his wife:

"MR. FARINA: Directing your attention to either late June or early July, 1975, did you have occasion to go to the residence of the defendant and Patricia Botham....?

"OFFICER MONTGOMERY: Yes, I did.

"MR. FARINA: With whom did you speak at the house?

"OFFICER MONTGOMERY: Pat Botham.

"MR. FARINA: What action, if any, did you take?

"OFFICER MONTGOMERY: I removed a quantity of handguns from the house.

"MR. FARINA: A week later, were you contacted by Patricia Botham?

"OFFICER MONTGOMERY: Yes, I was.

"MR. FARINA: Without saying what she said, what was she doing?

---

**5.** The trial court ruled that Dr. Doell's testimony was not admissible under the medical exception to the hearsay rule because he never treated Patricia Botham for the bruises.

"OFFICER MONTGOMERY: She was crying.

"MR. FARINA: What did you do thereafter with the handguns?

"OFFICER MONTGOMERY: Having no legal right to hold the guns, I returned them."

■ As a general rule, facts which logically tend to prove or disprove the fact in issue or which afford a reasonable inference or shed light upon the matter contested, are relevant. However, facts bearing so remotely upon or collateral to the issue, that they afford only conjectural inference, should not be admitted in evidence. *State v. Flett*, 234 Or. 124, 380 P.2d 634 (1963). *Wharton's Criminal Evidence*, § 153 (13th ed. C. Torcia).

■ The foregoing testimony, in its truncated version, is irrelevant to prove a relationship of ill will between the defendant and his wife.

Accordingly, the trial court erred in admitting the testimony of witnesses Doell and Montgomery.

### B.

The prosecution offered testimony of Jeanette Crawford, Ned Crawford, and Milo Vig to establish animosity between the defendant and Linda Miracle.

The Crawfords were neighbors of the Miracle and Botham families. Jeanette Crawford testified that in the early morning hours of June 15, 1975, she was awakened by a scream. She looked out her window and observed the defendant carrying Linda Miracle towards the Botham home. She testified that the defendant called to his wife and that Patricia Botham opened the door and the defendant carried Linda Miracle into the Botham house. She testified that a rescue vehicle arrived shortly thereafter.

Ned Crawford confirmed his wife's testimony. He testified that on June 15, 1975, he and his wife were awakened by a loud feminine scream and that he saw the defendant carrying something through his door.

Milo Vig testified that he questioned the defendant about the June 15, 1975 incident. He said that the defendant told him that he heard a scream, went to his porch, and saw Linda Miracle come out of her house onto her porch. The defendant told him that she collapsed and that he tried to revive her by mouth-to-mouth resuscitation, and then carried her across the street to his home. The defendant called the rescue squad.[6]

The trial court instructed the jury that the testimony of witnesses Jeanette and Ned Crawford, and Milo Vig could be considered "for the very limited purpose of either establishing or not establishing, as you see the evidence, a relationship of ill will between the defendant and Linda Miracle."

The defendant objected to the evidence on the grounds that it did not establish a relationship of ill will between the defendant and Linda Miracle, and moreover, the defendant's identity as the perpetrator of the assault was not established by clear and convincing evidence.

■ Generally, evidence which shows or tends to show that the defendant has committed a crime wholly independent of the offense for which he is on trial, is inadmissible. *Warford v. People*, 43 Colo. 107, 96 P. 556 (1908). Ill will between the victim and the defendant is one purpose for which evidence of other crimes may be admissible. *Wharton's Criminal Evidence*, § 263 (13th ed. C. Torcia). *See also, People v. Honey*, 198 Colo. 64, 596 P.2d 751 (1979). The commission of the prior crime and the defendant's identity as the perpetrator of the crime, however, must be shown by clear and convincing evidence. *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977); *State v. Strain*, 618 P.2d 331 (Mont.1980); *Tucker v. State*, 82 Nev. 127, 412 P.2d 970 (1966).

---

**6.** It is not clear from the record whether Linda Miracle was unable or refused to identify her assailant.

The evidence tending to show that the defendant assaulted Linda Miracle on the morning of June 15, 1975 is not clear and convincing. Moreover, admission of the testimony was highly prejudicial to the defendant. Accordingly, we conclude the trial court erred in allowing the jury to consider the testimony concerning the June 15, 1975 incident to establish animosity between the defendant and Linda Miracle.

### IV.

*Combined Effect of Cumulative Error*

The failure of the trial judge to recuse himself, coupled with the failure to grant a change of venue, and erroneous and prejudicial evidentiary rulings, require that a new trial be granted. Here, the cumulative effect of the errors committed at trial precluded the defendant from receiving a fair trial. *People v. Reynolds*, 194 Colo. 543, 575 P.2d 1286 (1978); *Oaks v. People*, 150 Colo. 64, 371 P.2d 443 (1962); *Gill v. People*, 139 Colo. 401, 339 P.2d 1000 (1959).

### V.

*Motion For Judgment of Acquittal*

The defendant asserts that the trial court erred in denying a motion for judgment of acquittal. Measuring the total quantum of evidence which was presented to the jury, we conclude that the motion for a judgment of acquittal was properly denied because there was substantial evidence to support a conviction when measured by the test forth in *People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973):

"The issue before the trial judge is whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt. (Citations omitted.)" *Id.* at 130, 515 P.2d 466.

Accordingly, the defendant's convictions are reversed and the cause is remanded to the district court for a new trial before a different judge consistent with the directions contained in this opinion.